POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY STOUT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SKYE BIOSCIENCE, INC., PUNIT DHILLON, KAITLYN ARSENAULT, and CHRISTOPHER G. TWITTY,<br><br>Defendants. | Case No. __'25CV3177 WQHDEB__<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Jeremy Stout ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public

1

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Skye Bioscience, Inc. ("Skye" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Skye securities between November 4, 2024 and October 3, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Skye is a clinical stage biopharmaceutical company that focuses on developing molecules that modulate G protein-coupled receptors ("GPCRs") to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

treat obesity, overweight,[1] and metabolic diseases.  The Company's lead product candidate is nimacimab, a peripherally restricted negative allosteric modulating antibody targeting cannabinoid receptor type-1 ("CB1"), a key GPCR involved in metabolic regulation.

3.     In August 2024, Skye initiated its "CBeyond" clinical trial, a twenty-six-week, randomized, double-blind, placebo-controlled Phase 2a proof-of-concept study designed to assess nimacimab as a treatment for obesity and overweight.  The CBeyond trial's primary endpoint was to demonstrate an 8% difference in mean weight loss using nimacimab versus placebo at twenty-six weeks, with a thirteen-week follow-up.

4.     At all relevant times while the Phase 2a Beyond trial was ongoing, Defendants touted nimacimab's purported "differentiated" mechanism of action and efficacy results as purportedly demonstrated in other various studies.  Critically, Defendants cited to nimacimab's purportedly potent efficacy as observed in these various studies to suggest that the results of the Phase 2a CBeyond trial were likely to be favorable, while consistently touting nimacimab's overall clinical, regulatory, and commercial prospects.

---

[1] "Overweight" is a defined medical condition according to body mass index ("BMI").  "Overweight" is defined, in adults, as having a BMI of 25 to 29.9, whereas "obesity" is defined, in adults, as having a BMI of 30 or more.  An individual can "have" overweight or obesity.

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding Skye's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) nimacimab was less effective than Defendants had led investors to believe; (ii) accordingly, nimacimab's clinical, regulatory, and commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.      On October 6, 2025, Skye issued a press release "announc[ing] the topline data from its 26-week Phase 2a CBeyond™ proof-of-concept study of nimacimab[.]"  The press release disclosed that the "the nimacimab monotherapy arm did not achieve the primary endpoint of weight loss compared to placebo" and that "preliminary pharmacokinetic analysis showed lower than expected drug exposure, potentially indicating the need for higher dosing as a monotherapy."

7.      On this news, Skye's stock price fell $2.85 per share, or ***60%***, to close at $1.90 per share on October 6, 2025.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Skye is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Skye securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Skye is a Nevada corporation with principal executive offices located at 11250 El Camino Real, Suite 100, San Diego, California 92130.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The Company's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "SKYE."

15.    Defendant Punit Dhillon ("Dhillon") has served as Skye's President and Chief Executive Officer at all relevant times.  During the Class Period, Defendant Dhillon sold 82,910 shares of Skye stock for total proceeds of approximately $413,925.

16.    Defendant Kaitlyn Arsenault ("Arsenault") has served as Skye's Chief Financial Officer at all relevant times.  During the Class Period, Defendant Arsenault sold 86,612 shares of Skye stock for total proceeds of approximately $432,406.

17.    Defendant Christopher G. Twitty ("Twitty") has served as Skye's Chief Scientific Officer at all relevant times.

18.    Defendants Dhillon, Arsenault, and Twitty are collectively referred to herein as the "Individual Defendants."

19.    The Individual Defendants possessed the power and authority to control the contents of Skye's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Skye's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Skye, and their access

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.    Skye and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.    Skye is a clinical stage biopharmaceutical company that focuses on developing molecules that modulate GPCRs to treat obesity, overweight, and metabolic diseases. The Company's lead product candidate is nimacimab, a peripherally restricted negative allosteric modulating antibody targeting CB1, a key GPCR involved in metabolic regulation.

22.    On August 22, 2024, Skye initiated its "CBeyond" clinical trial, a twenty-six-week, randomized, double-blind, placebo-controlled Phase 2a proof-of-concept study designed to assess nimacimab as a treatment for obesity and overweight. The CBeyond trial's primary endpoint was to demonstrate an 8% difference in mean weight loss using nimacimab versus placebo at twenty-six weeks, with a thirteen-week follow-up. The trial's secondary and exploratory

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

endpoints evaluated safety, tolerability, neuropsychiatric and cognitive outcomes, and change in body composition, as well as assessed synergistic outcomes of nimacimab in combination with semaglutide, a GLP-1 receptor agonist.

23.    At all relevant times while the Phase 2a Beyond trial was ongoing, Defendants touted nimacimab's purported "differentiated" mechanism of action and efficacy results as purportedly demonstrated in other various studies.  Critically, Defendants cited to nimacimab's purportedly potent efficacy as observed in these various studies to suggest that the results of the Phase 2a CBeyond trial were likely to be favorable, while consistently touting nimacimab's overall clinical, regulatory, and commercial prospects.

**Materially False and Misleading Statements Issued During the Class Period**

24.    The Class Period begins on November 4, 2024, when Skye issued a press release during pre-market hours announcing preliminary data from a diet-induced obesity ("DIO") model in mice.  The press release stated, *inter alia*, that "[p]eripherally-restricted nimacimab achieve[d] significant dose-dependent weight loss, fat mass reduction, lean mass preservation, and glycemic control in [DIO] model[,]" and that "[p]reliminary data shows that nimacimab achieves desired metabolic outcomes[.]"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

25.    On November 7, 2024, Skye issued a press release reporting its financial results for the third quarter ("Q3") of 2024 and recent business highlights. The press release quoted Defendant Dhillon as stating, in relevant part[2]:

> The third quarter marked an important transition for Skye as a metabolic-focused company with the launch of our Phase 2 obesity clinical trial for nimacimab. ***We believe our truly peripherally-restricted CB1 inhibitor has the differentiated attributes necessary to realize the unique benefits of this class of drug within the overall obesity landscape*** . . . . We also recently announced new preclinical data from a [DIO] model in mice. ***Nimacimab achieved significant dose-dependent weight loss of up to 16% compared to vehicle, highlighting the prominent role of peripherally-driven CB1 inhibition to induce weight loss and other metabolic benefits*** without relying on central CB1 inhibition and its risk of neuropsychiatric adverse events.

26.    The same day, Skye hosted a conference call with investors and analysts to discuss its Q3 2024 financial results and business updates.  During his prepared remarks on the call, Defendant Dhillon stated, in relevant part, that "we believe nimacimab's first-in-class profile as a perfectly targeting CB1 inhibitor offers the right combination of efficacy and safety that position it to realize a significant opportunity for CB1 inhibition to drive meaningful dose and weight loss, fat mass reduction and lean mass preservation, improve glycemic control and weight loss, and achieve other metabolic benefits[.]"

27.    On the same call, in response to an analyst's question regarding preclinical data that Skye had presented during a recent professional event,

---

[2] All emphases hereinafter are added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendant Dhillon stated, *inter alia*, that "the key takeaway is that, there's really strong preclinical efficacy of nimacimab" and "[i]t's demonstrating a significant dose dependent weight loss and it's shown this improvement in terms of glucose metabolism, as well as lean mass preservation[,] which purportedly "point[s] towards a favorable impact on body composition as well."

28.    Also on November 7, 2024, Skye filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q stated, in relevant part:

> During November 2024, we shared initial data from our DIO study **with nimacimab showing dose-dependent weight loss as well as positive changes in body composition and glycemic control upon treatment**. Further analysis and repeat studies are underway but we believe that true peripheral CB1 inhibition can positively impact metabolic disorders including obesity.
>
> **Given the distinct mechanism and beneficial attributes of nimacimab as a peripheral CB1 inhibitor, within the large and heterogeneous obesity landscape we believe there is significant opportunity for nimacimab to potentially complement GLP-1 agonists and other anti-obesity drug mechanisms of action as well as to have a potential role as a monotherapy.**

29.    Appended as exhibits to the Q3 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Dhillon and Arsenault certified, in relevant part, that the Q3 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

30. On March 20, 2025, Skye issued a press release reporting its financial results for the fourth quarter ("Q4") and full year ("FY") of 2024, as well as certain business updates. The press release stated, *inter alia*, that the "[i]nitial data from our [DIO] model in mice released in November 2024 . . . supports our hypothesis that nimacimab's peripherally-targeted CB1 inhibition drives significant weight loss and improved metabolic parameters, consistent with the compound's differentiated mechanism of action."

31. The same press release also quoted Defendant Dhillon as stating, in relevant part:

> Skye's prime accomplishment in 2024 was the initiation and rapid advancement of its comprehensive Phase 2a clinical study of nimacimab . . . . ***We believe nimacimab's product profile is well-positioned to potentially fulfill critical unmet needs in this rapidly evolving therapeutic area.***
>
> * * *
>
> We surpassed our enrollment target ahead of schedule and have to-date executed the Phase 2a clinical plan on target and within our budget. ***We disclosed preclinical data in November 2024 which achieved significant dose-dependent weight loss, significant fat mass loss with lean mass preservation, and dose-dependent improvement in glucose tolerance. These outcomes are indicative of the potentially compelling attributes of Skye's highly peripherally-restricted CB1 inhibitor.***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

32.    Also on March 20, 2025, Skye hosted a conference call with investors and analysts to discuss its Q4 and FY 2024 financial results and business updates. During his prepared remarks on the call, Defendant Dhillon touted Skye's purported "demonstration that nimacimab can drive significant weight loss in a [DIO] mirroring model[,]" that Defendants "look forward to sharing even more data that demonstrates the ability of nimacimab to not only drive weight loss, but also impact multiple metabolic processes associated with obesity and its comorbidity[,]" and that, "to date, nimacimab's truly peripheral mechanism has demonstrated meaningful weight loss[.]"

33.    The same day, Skye filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K stated, *inter alia*:

> ***We believe nimacimab stands apart from GLP-1's and other incretin-based weight loss therapies because its primary mechanism goes beyond suppression of food intake.*** While peripheral CB1 inhibition can reduce elevated leptin levels as well as modulate appetite-regulating hormones to broadly blunt appetite, key additional drivers of weight loss include increased energy expenditure, fat metabolism, and insulin sensitivity as well as reduced inflammation. ***As a result, clinical data from this class of drugs have demonstrated not only weight loss but also lean mass preservation, improved insulin sensitivity, and reductions in cholesterol. Additionally, preclinical obesity models using CB1 inhibitors have shown improvements in hyperleptinemia, leptin sensitivity, and increased energy expenditure. This unique mechanism offers a potential alternative, and even complementary, approach to chronic weight management, broadening therapeutic options for patients with obesity and overweight.***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

\* \* \*

Nimacimab functions as a negative allosteric modulator of CB1, which means it binds to a distinct area of CB1 'away' from the receptor's primary active site (the orthosteric site) **and thus inhibits CB1 activity without any competition from the endogenous ligands (endocannabinoids). This noncompetitive mode of action is distinct from small-molecule inhibitors**, which target CB1 receptor's orthosteric site and require successful competition with endocannabinoids for receptor occupancy to inhibit CB1 signaling. This can become critical as CB1 signaling is often overactive in metabolic diseases, and direct competition with an inverse agonist may be insufficient in tissues with excessive CB1 activity. In such disease states, where both CB1 receptor density and endocannabinoid levels are elevated, orthosteric small molecules must outcompete high concentrations of endocannabinoids, which can negatively impact their Pharmacokinetic ("PK") profile and ultimately limit their efficacy.

34.    Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Dhillon and Arsenault.

35.    On April 15, 2025, Skye issued a press release announcing new preclinical data for nimacimab in a murine DIO model.  The press release stated, *inter alia*, that "after 25 days of treatment, results demonstrated . . . [g]reater than 30% weight loss when nimacimab was combined with the dual GLP-1/GIP agonist, tirzepatide" and "[n]imacimab alone demonstrated 23.5% weight loss, comparable to monlunabant and tirzepatide alone."

36.    The same press release quoted Defendant Dhillon as stating:

**This new preclinical study highlights that a truly peripherally-restricted CB1 inhibitor—nimacimab—effectively drives weight loss**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in a DIO model. ***Nimacimab compared favorably to and provided significant additive weight loss when combined with GLP-1-targeted drugs like tirzepatide*** . . . . Using higher doses, this study builds on our previous preclinical DIO data in human CB1 knock-in mice ***that showed significant dose-dependent weight loss***. Biomarker analyses demonstrated that ***nimacimab-driven weight loss was associated with beneficial changes in key hormones, glycemic control, and inflammatory markers***.

[]Skye believes ***nimacimab shows potential both as a monotherapy and in combination with a GLP-1 targeted drug to address unmet needs in obesity with the potential to change weight loss standards of care***. Initial data from Skye's Phase 2a study in obesity is expected in late Q3/early Q4 2025.[]

[. . . .] The second key finding of this animal study is that Skye's highly-peripherally restricted ***nimacimab drives efficacy similar to a less-peripherally restricted CB1 inhibitor, monlunabant***, in a DIO model. ***These in vivo data continue to support our belief that our differentiated antibody approach can potentially provide meaningful efficacy[.]***

37.    On May 8, 2025, Skye issued a press release reporting its financial results for the first quarter ("Q1") of 2025 "and Highlight[ing] Nimacimab Differentiation in Obesity[.]"  The press release stated, *inter alia*, that "[n]imacimab in combination with tirzepatide improves weight loss effect over tirzepatide alone, and shows comparable weight loss to monlunabant and tirzepatide alone in preclinical [DIO] model[.]"

38.    The same press release also stated that "[i]n vitro data reported from new preclinical study highlights superior potency of . . . nimacimab[] versus monlunabant when tested under pathological levels of CB1 agonists[.]"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39.    In addition, the press release quoted Defendant Dhillon as stating, in relevant part:

Nimacimab continues to demonstrate a differentiated profile as a potential weight loss therapy, with a peripherally restricted mechanism that may set it apart from both GLP-1s and small-molecule CB1 inhibitors. We're advancing a body of preclinical and clinical evidence that supports its potential in reshaping the treatment landscape in obesity.

40.    Also on May 8, 2025, Skye hosted a conference call with investors and analysts to discuss its Q1 2025 financial results and business updates.  During his prepared remarks on the call, Defendant Dhillon stated, in relevant part:

[W]e generated compelling new preclinical data that further validates the potential of nimacimab as a weight loss therapy. Nimacimab continues to stand out with a differentiated mechanism that is distinct from both peripherally restricted small-molecule CB1 inhibitors and GLP-1 agonists. Importantly, our recent preclinical studies demonstrated a truly peripherally restricted antibody like nimacimab can potentially result in significant weight loss similar to a less restricted small molecule and nimacimab has the potential to provide additive weight loss to an incretin mimetic like tirzepatide.

* * *

These findings reinforce our belief that nimacimab has the potential to deliver durable weight loss[.]

41.    During his prepared remarks on the same call, Defendant Twitty stated, *inter alia*:

Recent biomarker analyses from our initial mouse DIO study have **further extended the impact of the dose-dependent weight loss observed with nimacimab treatment**. Specifically, now we can report **nimacimab-dependent reduction in fasting insulin levels that**

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

*complement significant glycemic control as well as productive modulation of key appetite-regulating hormones including GLP-1 and leptin.*

*Additional data sets also highlighted significant reduction of inflammation in adipose tissue as well as liver steatosis.* We are also happy to report that this initial study has now been repeated by an independent lab *with very reproducible results not only in terms of the magnitude of weight loss and body composition that is preservation of lean mass with significant reduction of fat mass, but also with positive changes in glycemic control.*

This repeat study also looked carefully at food consumption and noted a *significant reduction in cumulative caloric intake slightly less but in line with Semaglutide. Collectively, these studies highlight that Nimacimab-dependent efficacy is driven by multiple peripheral pathways coordinated through different organ systems.*

42.    Defendant Twitty likewise asserted during his prepared remarks, *inter alia*, that study "results combined with our mechanistic data strongly support the potential for Nimacimab to be effective as both a Monotherapy and as part of a combination approach to address the growing obesity epidemic[,]" that "*in vivo* studies continue to support our belief that our differentiated antibody approach can provide meaningful efficacy[,]" and that "[t]hese data suggest that Nimacimab may offer the widest possible therapeutic window among CB1 inhibitors potentially delivering significant metabolic benefits[.]"

43.    On the same call, in response to an analyst's question regarding how the results from Skye's preclinical studies, including the mouse DIO study, informed Defendants' confidence in the anticipated topline results from the Phase

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2a CBeyond trial, Defendant Dhillon stated, *inter alia*, that "across the board it checks a lot of boxes" and "[o]f course it gives you this aspect of well we feel more confident around the mechanism and there's this component that comes along with it that we expect it to translate into the clinic."

44.     Likewise, in response to the same question, Defendant Twitty stated, *inter alia*:

> So when you look at that all together, you really start to appreciate how we're matching exposure and ***we're looking at doses that are we feel very translatable***. And we've seen some success with predicting efficacy in the interim space and arguably looking at the CB1 space with Novo's data set which we feel is actually a pretty significant data set. This is actually a very I think a very strong data set and they too had DIO data that looked pretty strong. ***We reproduced that in our own lab. So coming back to this idea of translating we do feel pretty confident that we're going to have an active drug in the clinic.***

45.     Also on May 9, 2025, Skye filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q stated, in relevant part:

> During the three months ended March 31, 2025, we announced preclinical data ***supporting our hypothesis that . . . nimacimab[] is able to drive similar efficacy when compared to a less-peripherally restricted CB1 inhibitor, monlunabant, in a [DIO] murine model***. The results of the preclinical DIO study ***demonstrated greater than 30% weight loss when nimacimab was combined with the dual GLP-1/GIP agonist, tirzepatide. Nimacimab alone demonstrated 23.5% weight loss, which is comparable to monlunabant and tirzepatide alone in this study.***
>
> We also shared *in vitro* potency data ***demonstrating that nimacimab's non-competitive allosteric binding to CB1 provides potential***

17

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***advantages over orthosteric-binding small-molecule drugs***. Binding to a different site on the receptor, nimacimab does not compete with natural CB1 agonists such as anandamide (AEA) and 2-arachidonoylglycerol (2-AG). It can block CB1 activity even with an elevated concentration of CB1 agonists, which is associated with obesity. In contrast, orthosteric-binding small molecule inhibitors must compete with CB1 agonists for binding at the receptor's orthosteric site, which was shown to negatively impact potency when tested under elevated CB1 agonist concentrations. ***This distinction may give nimacimab a wider therapeutic window, with suitable potency at lower doses*** and less side effects.

***Given the distinct mechanism and beneficial attributes of nimacimab as a peripheral CB1 inhibitor, within the large and heterogeneous obesity landscape we believe there is significant opportunity for nimacimab to potentially complement GLP-1 agonists and other anti-obesity drug mechanisms of action as well as to have a potential role as a monotherapy.***

46.    Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Dhillon and Arsenault.

47.    On June 23, 2025, Skye issued a press release announcing the debut of its "*Anatomy of Progress*" nimacimab development update video series and the availability of presentations related to the development of nimacimab. The press release quoted Defendant Dhillon as stating, in relevant part:

Unlike the small molecule CB1 inhibitors currently in development, ***nimacimab's differentiating peripheral restriction has the potential to demonstrate the same weight loss and metabolic benefits previously seen in clinical trials by first-generation CB1 inhibitors***, without the significant neuropsychiatric liabilities that continue to plague its small molecule counterparts. ***So nimacimab is not just another anti-obesity***

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*drug, it represents a new frontier in how we think about fat metabolism, safety and long-term care.*

48.     On August 7, 2025, Skye issued a press release reporting its financial results for the second quarter ("Q2") of 2025 and business updates.  The press release stated, *inter alia*, that a "[n]ew preclinical study highlights [the] superior weight rebound profile of nimacimab compared to incretin therapy[,]" that "[p]reclinical data shows dosing nimacimab in combination with a low dose of tirzepatide resulted in enhanced weight loss compared to an optimal dose of tirzepatide[,]" and that, "[u]sed as a maintenance treatment, a preclinical study of nimacimab reduced the weight rebound effect observed in mice treated with tirzepatide alone or in combination with nimacimab."

49.     The same press release also quoted Defendant Dhillon as stating, in relevant part:

> We believe nimacimab's peripherally-restricted CB1 mechanism represents a fundamentally different approach, ***one that could offer real-world advantages as a monotherapy or in combination***, without compounding gastrointestinal side effects. As the market evolves, we see a growing need for therapies that deliver broader metabolic benefit, improved persistence, and combinability and ***we believe nimacimab is uniquely positioned to help define this next chapter in obesity care***.

50.     Also on August 7, 2025, Skye hosted a conference call with investors and analysts to discuss its Q2 2025 financial results and business updates.  During his prepared remarks on the call, Defendant Dhillon discussed at length nimacimab's observed efficacy, as well as its potential clinical, regulatory, and

19

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

commercial prospects. For example, Defendant Dhillon touted, *inter alia*, nimacimab's purported "robust, reproducible and mechanistically distinct" results in the Company's DIO models, as well as the drug's "demonstrat[ion of] durable posttreatment weight loss compared to incretin therapy after the therapy stopped[,]" representing that "[n]imacimab is not just an alternative" but "a next-generation backbone candidate for durable, combinable and more accessible obesity care" with "a platform that can potentially extend beyond monotherapy to life cycle expansion across lines of therapy and patient segments that are currently underserved by today's options."

51. The same day, Skye filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q stated, *inter alia*:

> We recently shared new data from a preclinical [DIO] mouse model **which provides further evidence for the potential combination of nimacimab with incretins and demonstrated the potential durability of response with nimacimab as a monotherapy or maintenance therapy post-incretin treatment** . . . . The preclinical DIO study also demonstrated that, **when used as a monotherapy, nimacimab-driven weight loss persisted for about 20 days after treatment cessation, while mice treated with tirzepatide alone regained most of their lost weight within a week post-treatment**. Lastly, the preclinical DIO study demonstrated that **when nimacimab alone was used after an initial tirzepatide or combination treatment in the preclinical DIO mouse model, it reduced rebound weight gain in these groups of mice**.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

52.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Dhillon and Arsenault.

53.    The statements referenced in ¶¶ 24-52 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Skye's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) nimacimab was less effective than Defendants had led investors to believe; (ii) accordingly, nimacimab's clinical, regulatory, and commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

54.    Defendants likewise violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Skye to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose that nimacimab was less effective than they had led investors to believe, and that nimacimab's clinical, regulatory, and commercial prospects were overstated, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **The Truth Emerges**

55.     On October 6, 2025, during pre-market hours, Skye issued a press release announcing topline data from its Phase 2a CBeyond clinical trial, revealing that the trial had failed to meet its primary endpoint.  Specifically, the press release stated, *inter alia*:

- *Nimacimab monotherapy did not meet its primary endpoint for weight loss; preliminary pharmacokinetic analysis showed lower than expected drug exposure, potentially indicating the need for higher dosing as a monotherapy.*

\* \* \*

In CBeyond$^{TM}$, the nimacimab monotherapy arm did not achieve the primary endpoint of weight loss compared to placebo (-1.52% vs. -0.26 for placebo, mITT1). Preliminary pharmacokinetic analysis showed an association between exposure and response, suggesting that the 200 mg, subcutaneous weekly dose was suboptimal as a monotherapy.

\* \* \*

**CBeyond$^{TM}$ Phase 2a Topline Results at 26 Weeks**

- **Monotherapy dosed at 200 mg demonstrated lower than expected drug exposure.** In the monotherapy arm, nimacimab 200 mg did not achieve the primary endpoint, with placebo-subtracted weight loss of -1.26% at week 26 (p=0.2699, mITT). Preliminary pharmacokinetic analysis showed lower than expected drug exposure of nimacimab, supporting evaluation of higher dosing.

(Emphases in original.)

56.     On this news, Skye's stock price fell $2.85 per share, or ***60%***, to close at $1.90 per share on October 6, 2025.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

58.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Skye's securities, Defendant Dhillon enriched himself by approximately $413,925 by selling 82,910 shares of Skye common stock, whereas Defendant Arsenault enriched herself by approximately $432,406 by selling 86,612 shares of Skye common stock.

59.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Given that nimacimab is Skye's lead product candidate, Defendants were undoubtedly highly focused on nimacimab's observed efficacy, as well as its clinical, regulatory, and commercial prospects, while they were disseminating the materially false and misleading statements alleged herein. Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Skye securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Skye securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Skye or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

62.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Skye;

- whether the Individual Defendants caused Skye to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Skye securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

65.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

66.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Skye  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Skye securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

67.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

68.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

69.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they

27

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Skye securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Skye securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Skye securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Skye's finances and business prospects.

73.    By virtue of their positions at Skye, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

74. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Skye, the Individual Defendants had knowledge of the details of Skye's internal affairs.

75. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Skye. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Skye's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Skye securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Skye's business and financial condition

29

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Skye securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

76. During the Class Period, Skye securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Skye securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Skye securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Skye securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

77. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

79.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     During the Class Period, the Individual Defendants participated in the operation and management of Skye, and conducted and participated, directly and indirectly, in the conduct of Skye's business affairs.  Because of their senior positions, they knew the adverse non-public information about Skye's misstatement of income and expenses and false financial statements.

81.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Skye's financial condition and results of operations, and to correct promptly any public statements issued by Skye which had become materially false or misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Skye disseminated in the marketplace during the Class Period concerning Skye's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Skye to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Skye within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Skye securities.

83.    Each of the Individual Defendants, therefore, acted as a controlling person of Skye.  By reason of their senior management positions and/or being directors of Skye, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Skye to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Skye and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

84.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Skye.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2025                    Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS