**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY STOUT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SKYE BIOSCIENCE, INC., EMERALD HEALTH SCIENCES INC., MFDI, LLC, and PUNIT DHILLON,<br><br>Defendants. | Case No. 3:25-cv-3177-WQH-DEB<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff Randall Scott Therrell ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his undersigned attorneys, allege in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Skye Bioscience, Inc. ("Skye" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Skye's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning Skye; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I. NATURE OF THE ACTION

1. Defendants orchestrated a pump-and-dump scheme to enrich themselves at the expense of Plaintiff and other ordinary retail investors. Skye is a microcap biotech company led by CEO Punit Dhillon ("Dhillon") and affiliates of the so-called "Emerald Group". For years, they promoted unproven cannabinoid drugs to inflate the stock price, raise tens of millions of dollars from investors, and enable insiders and related parties to cash out at artificially high valuations. This lawsuit seeks to hold these Defendants accountable for their misconduct and fraud.

2. The story begins with a struggling public shell company. Originally incorporated in 2011 as Load Guard Transportation, the entity morphed through mergers into Nemus Bioscience ("Nemus"), a development-stage biopharma company focused on cannabis-derived therapeutics in partnership with the University of Mississippi. By 2018, the company was cash-strapped in persistent

early stage development with no revenue. That changed when it entered the orbit of the Emerald Group.

3. Emerald Health Sciences Inc. (“Sciences”) and its network (including Emerald Health Therapeutics, Emerald Health Pharmaceuticals, and VivaCell) poured money into Nemus via convertible loans, stock purchases, and credit facilities. In 2018, Sciences controlled roughly 50% of the company; by 2019, over 68%. Board control shifted to Emerald insiders, including Dhillon. Nemus renamed itself Emerald Bioscience, then Skye Bioscience in 2020-2021 to distance itself from growing federal investigations and fraud indictments.

4. Skye routinely paid related parties for leases, research services, and consulting fees to route money back into the Emerald ecosystem. Sciences provided advisory services and loans on favorable terms; VivaCell (a Spanish subsidiary) received research contracts; Emerald Health Pharmaceuticals shared office space and personnel overlaps. Meanwhile, Emerald insiders like Dr. Avtar Dhillon (Punit’s uncle and Sciences chairman) faced serious legal trouble. In connection with a scheme that is remarkably identical to the one alleged herein, the FBI arrested Dr. Avtar Dhillon in 2021 for securities fraud tied to a $1 billion pump-and-dump scheme followed by SEC charges, guilty pleas, and prison time.

5. The same story played out here with Skye except that instead of Dr. Avtar Dhillon being at the helm, his nephew—Defendant Punit Dhillon—was at the top. Starting in late-2022 and through 2023, Skye began repeatedly touting preclinical success for its lead glaucoma candidate NB1111—an eye-drop cannabinoid formulation—claiming strong IOP reduction in animal models and human tissue studies.

6. When Phase 1 results finally came in October 2023, they were spun as “positive” for safety, despite no meaningful IOP reduction versus placebo in the main analysis. Skye highlighted a small subgroup with low side-effect rates. Phase 2 trials proceeded amid cash shortages, only for Skye to later abandon the entire

program after it failed its primary endpoint in June 2024. The stock dropped ~9% on that news but the extended damage, carefully orchestrated by Defendants, was already done.

7. Facing a working capital deficit, mounting legal judgments (in part from a whistleblower lawsuit), and the need for more funding, Skye executed a bold pivot and acquired a new lead drug candidate nimacimab (a peripheral CB1 inhibitor previously shelved after a Phase 1 NAFLD study). Skye's announcement was followed by massive PIPE capital raises ($90M+ in early 2024), a NASDAQ uplisting in April 2024, and heavy promotion of nimacimab for obesity and metabolic disease.

8. Skye aggressively marketed nimacimab's "differentiated" peripheral mechanism, preclinical weight-loss data in mice (up to 16%), and potential advantages over GLP-1 drugs. Analysts piled on with bullish targets ($12-$21/share). The Company raised significant capital, completed enrollment in the Phase 2 "CBeyond" trial ahead of schedule, and repeatedly expressed confidence in upcoming data.

9. Amongst the hype, insiders and affiliates started to unload their shares. Skye filed multiple S-8 and S-3 registration statements to allow for the resale of millions of shares tied to employee and consultant incentive plans, PIPE investors, and warrants. Defendant CEO Dhillon's beneficial ownership reports and other SEC filings show inconsistencies and unaccounted-for shares/transactions, indicating he personally and/or indirectly unloaded thousands of shares without properly disclosing the sales under SEC reporting regulations. Sciences also distributed hundreds of thousands of Skye shares to its own shareholders as a "return of capital" in August 2024. Restricted stock units (or RSUs) also vested and were sold (including "sell-to-cover" transactions). This all occurred while Skye's stock traded at inflated levels thanks to hyped reports about nimacimab's clinical potential.

10. In October 2025, the CBeyond Phase 2 trial missed its primary weight-loss endpoint. Preliminary PK data suggested insufficient drug exposure. The stock cratered ~60% in one day. Analysts downgraded Skye, citing reconciliation issues with the proposed mechanism of action. By early 2026, Skye faced a NASDAQ minimum bid price deficiency.

11. Skye is currently teetering on the verge of bankruptcy. It has no substantive operations to speak of and just a few million dollars in cash left on its balance sheet. Its stock trades for less than $1/share. Plaintiff and other ordinary retail investors who bought in on the hype around NB1111 and nimacimab were left holding the bag. Defendants should be held accountable for the damages they caused.

## II. JURISDICTION AND VENUE

12. Plaintiff brings this action on behalf of himself and other similarly situated investors to recover losses sustained in connection with Defendants' fraud alleged herein.

13. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Skye is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail,

interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

17. Plaintiff Randall Scott Therrell purchased Skye common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's previously filed certification evidencing his transaction(s) in Skye common stock is hereby incorporated by reference herein. *See* ECF No. 3-3.

18. Skye Bioscience, Inc. is a Nevada corporation with principal executive offices located at 11250 El Camino Real, Suite 100, San Diego, California 92130. Prior to April 11, 2024, Skye's stock traded on over-the-counter or OTC markets. On April 11, 2024, Skye's stock was uplisted to the Nasdaq Global Stock Market (the "NASDAQ") where it traded under the ticker symbol "SKYE" during the Class Period. Between March 22, 2024 and March 9, 2026, Skye had between 11 and 16 full-time employees.

19. Emerald Health Sciences, Inc. ("Sciences" or "EHS") is a British Columbia company with principal executive offices located at 1111 West Hastings St., 15th Floor, Vancouver, British Columbia, V6E 2J3, Canada. At all relevant times, Sciences was considered a "related party" due to its controlling interest in Skye vis-à-vis MFDI, LLC.

20. MFDI, LLC ("MFDI") is a California limited liability company with principal executive offices located at 786 Road 188, Delano, California 93215. At all relevant times, MFDI had a controlling interest in Sciences and maintained a significant equity interest in Skye.

21. Defendant Punit Dhillon has, at all relevant times, served as the Chair of the Board of Directors and as the Company's President and Chief Executive Officer ("CEO"). Dhillon also served as a director of Sciences. Dhillon is the nephew of Dr. Avtar Dhillon and the co-founder and former President and CEO of

OncoSec Medical, Inc., both of whom as discussed below were investigated and/or indicted and sentenced for securities fraud.

22. Defendants Skye, Sciences, MFDI, and Dhillon are collectively referred to herein as the "Defendants."

23. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Skye common stock by engaging in the violative conduct alleged herein, which caused Skye common stock to trade at artificially inflated prices during the Class Period.

24. The corporate Defendants are liable for the acts of Defendant Dhillon and/or other employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

25. The scienter of Defendant Dhillon, and other employees and agents of the corporate Defendants are similarly imputed to Skye, Sciences, and MFDI under *respondeat superior* and agency principles.

## IV. RELATED NON-PARTY

26. Dr. Avtar Dhillon is central to the Emerald Group and has faced significant legal consequences for securities violations. In December 2024, he was sentenced to prison and ordered to forfeit $1.493 million. He had pleaded guilty to three felony counts: willful failure to disclose stock sales, aiding and abetting the sale of unregistered securities, and a touting compensation nondisclosure conspiracy. These charges stemmed primarily from concealing ownership of millions of Arch Therapeutics shares through nominee entities, selling them for personal gain and failing to report the transactions.

27. Dr. Avtar Dhillon was also a defendant in major SEC civil actions, including a large microcap fraud scheme involving promoter Frederick L. Sharp. He consented to a final judgment with over $10 million in disgorgement and a permanent penny stock bar. In a separate settled matter involving Emerald Health

Pharmaceuticals, he and the company were charged with concealing $32.5 million in undisclosed promotional payments while raising investor funds.

## V. SUBSTANTIVE ALLEGATIONS

### A. Corporate Inception of the Registered Entity Now Known as Skye

28. The registered entity now known as Skye first came into existence as Load Guard Transportation, Inc. ("LGT"), incorporated in Nevada on March 16, 2011. LGT then changed its name to Load Guard Logistics, Inc. ("LGL") on November 6, 2012. LGT operated a transport and delivery services business.

29. On January 30, 2013, LGL filed an initial Prospectus on Form S-1 with the SEC, as amended and declared effective on June 12, 2013, for the initial public offering of 2,845,000 shares of common stock at $0.05 per share, of which 845,000 were offered by selling shareholders and 2,000,000 were offered by LGL. The company sought to raise $100,000 under the offering.

30. On November 1, 2013, LGL closed its initial public offering, selling 476,000 shares and raising a total of $23,800.

31. Upon the completion of this offering, LGL sought to have its shares quoted on the Over the Counter-Bulletin Board ("OTCBB"), operated by FINRA (Financial Industry Regulatory Authority), under the symbol "LGLR".

32. LGL, however, struggled to drum up public interest. Indeed, at no point were shares of LGL publicly traded under the symbol "LGLR".

33. On October 17, 2014, LGL, and Nemus, a California corporation, entered into an Agreement and Plan of Merger under which Nemus would be the surviving registered entity, changing its name to "Nemus Bioscience, Inc."

34. The merger resulted in the change in control of the registered entity from LGL beneficial owners to Nemus stockholders. In addition, John B. Hollister (CEO of Nemus), Cosmas N. Lykos (Co-founder and Chairman of Nemus) and Gerald W. McLaughlin were appointed as members of the registered entity's board of directors, effective upon the closing of the merger.

35. On November 25, 2014, the registered entity's trading symbol on the OTCBB changed to "NMUS" to reflect its name change.

36. Since its July 2012 inception, Nemus operated as a biopharmaceutical company focused on the discovery, development, and commercialization of cannabis-based therapeutics through its partnership with the University of Mississippi ("UM").

37. At all relevant times, UM held the only contract to cultivate cannabis for research purposes on behalf of the U.S. Federal Government since 1968, and it has significant expertise in cannabis cultivation and the extraction, separation, process and manufacture of cannabis extracts containing cannabinoid molecules.

38. Cannabinoids are a class of chemically diverse compounds that are mainly found in extracts from the cannabis plant. These compounds express their physiological response by binding to specific cannabinoid receptors (CB1 and CB2), which are found throughout the body.

39. From July 2013 until around June 2018, Nemus was UM's sole partner for the development and commercialization of drugs derived from cannabinoids in the U.S. Such product candidates under development by Nemus, in partnership with UM, included: NB1111 for the treatment of glaucoma; NB2221 for the treatment of multiple sclerosis spasticity; NB31R1 for the treatment of MRSA; NB23R1 for the treatment of epilepsy; and NB51R1 for the treatment of anxiety.

40. Until June 2024 (detailed further below), Nemus' lead product candidate was NB1111, also known as SBI-100 Ophthalmic Emulsion ("SBI-100 OE"), a CB1 agonist, formulated as an eye drop to reduce intraocular pressure ("IOP"), for the treatment of glaucoma.

41. Glaucoma is an ocular neuropathy associated with the initiation of programmed cell death, known as apoptosis, of the retinal ganglion cells, or RGCs, of the optic nerve, resulting in progressive and irreversible loss of vision.

42. Ultimately, increased IOP is believed to be a main cause of optic nerve damage in glaucoma. Elevated IOP can lead to damage of RGC axons through vascular ischemia by compromising blood flow to the cells, and physical crush injury as the elevated IOP compresses these delicate cells.

43. According to Nemus, cannabinoid receptors are highly concentrated in the eye, especially in the anterior compartment of the eye that helps regulate IOP, and the posterior compartment of the retina and optic nerve.

**B. The Company Joins the Emerald Group's Web**

44. Nemus was, at all relevant times, considered to be in the development stage, focusing its efforts on securing product licenses, raising capital, and building infrastructure, and at no point had it realized revenue from its planned operations.

45. The Company first became intertwined with the "Emerald Group" when, on December 28, 2017, then-Nemus announced that it had entered into a Secured Promissory Note and Security Agreement for a convertible loan (the "Bridge Loan") with Defendant Sciences, providing Nemus gross proceeds of up to $900,000, secured by all of its assets.

46. Then, on January 19, 2018, Nemus announced that it had entered into a Securities Purchase Agreement with Sciences pursuant to which Nemus issued and sold to Sciences 60,000 shares of common stock, and a warrant to purchase 81,600 shares of common stock for a term of five years for aggregate gross proceeds of $1,500,000 (the "Initial Closing").[1] Pursuant to the Securities Purchase Agreement, Sciences also committed to purchase a minimum of at least 40,000 shares of common stock and at least 54,400 warrants at the same price on or before February 28, 2018 (the "Second Closing").

[1] On September 7, 2023, Skye announced a 1-for-250 reverse stock split of its issued and outstanding common stock, effective September 8, 2023. References herein to shares of Skye common stock reflect amounts on an as-converted basis.

47. Concurrently with the Initial Closing, the outstanding balance of the Bridge Loan automatically converted into 36,000 shares of common stock.

48. Consequently, as of the Initial Closing, a change of control occurred, and Sciences beneficially owned approximately 50.5% of Nemus common stock.

49. Additionally, pursuant to the terms of the Securities Purchase Agreement and effective as of the Initial Closing, each existing member resigned from Nemus' board of directors (the "Board"), with the exception of Dr. Brian S. Murphy, then-director, CEO and Chief Medical Officer ("CMO") of Nemus, including Cosmas N. Lykos, Douglas S. Ingram, Thomas A. George and Gerald W. McLaughlin; the size of the Board was reduced to three directors; and Punit Dhillon and James ("Jim") Heppell were appointed thereto.

50. The Second Closing occurred on February 16, 2018, pursuant to which the Company issued and sold to Sciences 60,000 shares of common stock, and 81,600 warrants, for aggregate gross proceeds of $1,500,000.

51. Then, on October 5, 2018, Nemus entered into a Multi-Draw Credit Agreement (the "Credit Agreement") with Sciences. The Credit Agreement provided for a credit facility to the Company of up to $20,000,000, was unsecured, and set to mature on October 5, 2022. Under the Credit Agreement, Sciences had the option to convert amounts outstanding to common stock at a fixed conversion price of $0.40 per share (prior to reverse stock split). Additionally, in connection with each advance under the Credit Agreement, the Company agreed to issue to Sciences a warrant to purchase up to one half of the common stock such advance may be converted into pursuant to the terms of the Credit Agreement at an exercise price of $0.50 per share (prior to reverse stock split). Each Warrant would be immediately exercisable upon issuance and was set to expire on the five-year anniversary of the date of issuance.

52. Additionally, effective October 5, 2018, the Nemus Board (consisting of Dr. Murphy, Punit Dhillon, and Jim Heppell) appointed Dr. Avtar Dhillon as Executive Chairman of the Company.

53. On November 1, 2018, the Company affected an initial draw under the Credit Agreement in the amount of $2,000,000 and issued Sciences a warrant to purchase 10,000 shares of common stock.

54. By December 31, 2018, Sciences beneficially owned 68% of Nemus' issued and outstanding shares of common stock.

55. On February 1, and March 29, 2019, the Company affected the second and third draws under the Credit Agreement each in the amount of $2,000,000 and issued Sciences a warrant to purchase 10,000 shares of common stock, bringing the aggregate principal balance to $6,000,000 as of March 31, 2019.

56. On March 7, 2019, after obtaining the approval of the Board and majority stockholder of Nemus (*i.e.*, Sciences), Nemus filed a Certificate of Amendment to its Articles of Incorporation changing its name to "Emerald Bioscience, Inc.", with a delayed effective date of March 25, 2019. In connection with the name change, FINRA assigned a new stock symbol, "EMBI".

57. When announcing the change, then-CEO Dr. Murphy declared: "Our new name better represents our relationship with the Emerald Group and our common goal to be leaders in advancing cannabinoid science. …With our robust pipeline based on our proprietary bioengineered cannabinoid technology, partnerships with leading institutions, and strides in manufacturing, we are committed to developing therapies that will change the lives of patients with significant unmet medical needs."

**C. <u>The History of the Emerald Group</u>**

58. According to the companies, the source of funds for the Securities Purchase Agreement and the Bridge Loan by and between the Company and Sciences, securing its control over the Company, was working capital of Sciences.

59. Sciences was incorporated in British Columbia in 2013 as "Medna Biosciences," co-founded by Dr. Avtar Dhillon (Punit Dhillon's uncle) and Yadvinder Kallu. Maheep Dhillon (Punit Dhillon's brother) and Jim Heppell were also involved with Sciences from the beginning.

60. Since its inception, Sciences has operated as a private investment firm used to hold shares of its various public and privately held subsidiaries, chief among them being Emerald Health Therapeutics, Inc. ("Therapeutics"), Emerald Health Pharmaceuticals, Inc. ("Pharmaceuticals"), and VivaCell Biotechnology España, S.L.U (formerly known as Emerald Health Biotechnology España, S.L.U.) ("VivaCell").

61. Sciences entered the cannabis industry when Mr. Kallu secured a Health Canada medical marijuana license for his family's farm in Richmond, B.C. This farm became the operational 'engine' of the Emerald Group.

62. In 2015, Sciences effected a reverse merger, acquiring control of a public shell to create Therapeutics, thereby obtaining access to public capital markets without a traditional IPO. Therapeutics described itself as committed to creating new consumer experiences with distinct recreational, medical, and wellness-oriented cannabis products with an emphasis on innovation, science, and product excellence.

63. Once public, Therapeutics raised hundreds of millions of dollars from retail investors while Sciences systematically removed cash through inter-company fees. Between 2015 and 2020, Therapeutics paid Sciences over $15 million in management consulting fees despite Sciences having no consulting expertise. Accordingly, while Therapeutics accumulated approximately $240 million in losses, Sciences' insiders extracted value through these fee arrangements. Additionally, corporate filings show Sciences made an estimated $23 million in net earnings for its investors through various financing agreements and shares held.

64. In March 2017, Pharmaceuticals was incorporated in Delaware and headquartered in San Diego, CA. From the outset, Pharmaceuticals described itself as a biotechnology company formed to acquire, develop, and commercialize drug candidates based on patented new chemical entities derived from cannabis.

65. Since inception, Pharmaceuticals received advances from Sciences to fund its operations, under a revolving loan agreement. Pharmaceuticals began its operations by acquiring certain intellectual property from VivaCell, a subsidiary of Sciences.

66. This transaction created another circular cash flow in the Emerald Group: public money from Therapeutics was paid to Pharmaceuticals for research, which then paid VivaCell for services, which was in turn controlled by Sciences' insiders. The same circular cash flow later seen through the Company and its involvement with the Emerald Group.

67. Indeed, at the time of Mr. Heppell's appointment to the Board of Nemus in January 2018, he also served as a Director of Sciences, Therapeutics, Pharmaceuticals, and VivaCell. Likewise, when appointed to the Board of Nemus, Punit Dhillon also served as a Director of Sciences, Pharmaceuticals, and VivaCell.

68. At the time of Dr. Avtar Dhillon's appointment as Chairman of the Company in October 2018, he also served as Chairman, CEO, and President of Sciences; as President and Chairman of Therapeutics; and as Chairman of Pharmaceuticals.

69. While Dr. Avtar Dhillon subsequently resigned as Executive Chairman and from his position of Chairman of the Finance and Business Development Committee on December 17, 2019, he remained abreast of the Company's internal affairs through its Board Observer Agreement with Sciences.

70. The Board Observer Agreement, executed December 19, 2019, gave Sciences the right to designate one observer to the Company's Board for so long as Sciences maintained ownership of any securities in the Company. Under the Board

Observer Agreement, the board observer was permitted to attend all meetings (whether in person, telephonically or otherwise) of the Board in a non-voting, observer capacity. Sciences appointed Dr. Avtar Dhillon as its board observer.

71. Concurrently, the Board also appointed Punit Dhillon as Chairman of the Board and as Chairman of the Finance and Business Development Committee of the Board, to fill the vacancies created by the resignation of Dr. Avtar Dhillon.

72. Then, in August 2020, Punit Dhillon was also named CEO of the Company following the termination of Dr. Murphy.

73. While serving in his various leadership positions at Skye, Punit Dhillon has been actively involved with the Emerald Group serving as: (i) Director of Pharmaceuticals from March 2017 to August 2022; (ii) Interim President of Pharmaceuticals from July 2022 to October 2022; (iii) Director of Therapeutics from June 2019 to November 2022; (iv) Director of Sciences until August 2020; and (v) Director of VivaCell until September 2021.

### D. The Emerald Group Under Scrutiny and Crumbling

74. In October 2020, the RCMP and Delta Police executed Project Big Smoke, raiding the Kallu farm in Richmond B.C. and seizing over 18,000, unlicensed, cannabis plants and 1,400 pounds of dried product. In total, police say this illegal operation was worth roughly $18 million annually. Investigators linked the operation back to organized crime, specifically the Hells Angels and UN Gang. This effectively ended the cannabis front for the Emerald Group and prompted its pivot to pharmaceutical assets and subsequent merger between Therapeutics and Skye.

75. To create distance from the Emerald Group, on November 13, 2020, EMBI, amended its Articles of Incorporation to change its name to "Skye Bioscience, Inc.", effective as of January 19, 2021. In connection with the name change, FINRA assigned a new stock symbol, "SKYE".

76. Then, on August 6, 2021, Dr. Avtar Dhillon was arrested by the FBI for securities fraud and conspiracy in connection with Frederick L. Sharp and the Sharp Group's $1 billion pump-and-dump scheme. *See United States v. Dhillon*, 1:21-mj-07174-JCB, ECF No. 3 (D. Mass Aug. 3, 2021).

77. Dr. Avtar Dhillon was also charged by the SEC for his role in this large-scale international microcap fraud schemesinvolving Arch Therapeutics, Inc. and OncoSec Medical, Inc. *See SEC v. Sharp, et al.*, Case No. 1:21-cv-11276-WGY, ECF No. 1 (D. Mass. Aug. 5, 2021).

78. That same day, August 6, 2021, Therapeutics announced that Dr. Avtar Dhillon had resigned from his roles as director and Executive Chair of Therapeutics and its subsidiaries and that Mr. Heppell was appointed Chair of Therapeutics.

79. Around this time, the DOJ and SEC were also investigating Dr. Avtar Dhillon and others at Pharmaceuticals for participating in a securities conspiracy.

80. On June 10, 2022, Pharmaceuticals received a "Wells Notice" from the SEC. The Wells Notice stated that SEC Staff had made a preliminary determination to recommend that the SEC file an enforcement action against Pharmaceuticals alleging violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Pharmaceuticals' then-CEO and Director, Dr. James DeMesa, and Chief Financial Officer ("CFO"), Lisa Sanford, also received Wells Notices for the same potential violations.

81. On September 30, 2022, the SEC charged Pharmaceuticals, Dr. Avtar Dhillon, and Dr. DeMesa for their involvement in a scheme to conceal $32.5 million paid for undisclosed promotions for securities offerings. *See SEC v. Mikula, et al.*, Case No. 2:22-cv-07096 (C.D. Cal. Sept. 30, 2022). The SEC alleged that from 2020 through 2021, Pharmaceuticals and members of its leadership participated in a fraudulent promotional scheme, paying undisclosed compensation

for stock promotion. According to the SEC, Pharmaceuticals raised approximately $30 million from thousands of investors through these fraudulent promotions.

82. Settlements with the SEC were reached shortly after the complaint was filed, and on October 20, 2022, the SEC issued its final judgment against Pharmaceuticals, Dr. DeMesa, and Dr. Avtar Dhillon. Notably, Mr. Heppell paid a $517,000 SEC settlement on behalf of Pharmaceuticals.

83. Then, in December 2022, Dr. Avtar Dhillon pleaded guilty to one count of willful failure to disclose stock sales and one count of aiding and abetting the sale of unregistered securities relating to shares of Arch Therapeutics that Dr. Avtar Dhillon beneficially owned, and one count of touting compensation nondisclosure conspiracy relating to his involvement in the securities conspiracy involving Pharmaceuticals. In pertinent part, Dr. Avtar Dhillon admitted to using nominee shell companies to hide his ownership and dump millions of shares on retail investors, collecting approximately $1.34 million in proceeds.

84. On December 4, 2024, Dr. Avtar Dhillon was convicted and sentenced to four months prison to be followed by one year of supervised release, with the first six months on home detention. He was ordered to forfeit more than $1.49 million.

85. Notably, Punit Dhillon served as a director of Pharmaceuticals from March 2017 until August 2022, and as a director of Arch Therapeutics, Inc. from July 20, 2018 until August 14, 2024. Additionally, Punit Dhillon is a co-founder of OncoSec Medical and served as the company's CEO from March 2011 until November 2017, as President until May 2018, and as a Director until February 2020.

86. In 2022, Pharmaceuticals was written down to zero, taking a $48 million impairment in a single year. It then filed for dissolution on March 17, 2023.

**E. Skye's Participation in The Emerald Group's Circular Cash Flow**

*1. Skye's Payouts to Pharmaceuticals*

87. Since inception, Pharmaceuticals maintained its principal executive offices as 5910 Pacific Center Blvd., San Diego, CA 92121.

88. Despite publicly reporting the Company's principal executive offices located at the same address, 5910 Pacific Center Blvd., San Diego, CA 92121, since as early as August 2020, when reporting its financial results for the three-month period ended June 30, 2021 on Form 10-Q, filed with the SEC on August 6, 2021, Skye declared "related party matters" to include "a month-to-month lease agreement, effective April 30, 2021, with Emerald Health Pharmaceuticals as the sublessor and the Company as the sublessee. Under the sublease agreement the Company pays monthly base rent of $4,000 in addition to its share of common area expenses and utilities." For the three and six months ended June 30, 2021, Skye reportedly recognized $6,000 in expenses under the sublease, and paid Pharmaceuticals $4,000 for a security deposit.

89. Then, on September 14, 2021, the Company filed a Current Report with the SEC on Form 8-K indicating that it had moved into new offices located at 11250 El Camino Real, Suite 100, San Diego, California, leased pursuant to an Office Lease with ROIC California, LLC, a Delaware limited liability company, dated as of August 25, 2021. The Company has since maintained this address as its principal executive offices.

90. When reporting its financial results for the three-month period ended September 30, 2021 on Form 10-Q, filed with the SEC on November 10, 2021, Skye again declared "related party matters" to include the sublease with Pharmaceuticals but now reported that the agreement was terminated on August 31, 2021. For the three and nine months ended September 30, 2021, Skye reportedly recognized $8,830 and $15,453, respectively, in sublease expenses.

*2. Skye's Payouts to VivaCell*

91. On October 3, 2018, the Company entered into a research agreement with VivaCell, a Sciences subsidiary located in Córdoba, Spain, reportedly focused on cannabinoid pharmaceutical research. Under this agreement, VivaCell was to provide its contract research organization ("CRO") services to Nemus to elucidate the mechanism of action of proprietary formulations and dosage forms for the product candidates under development by the Company. Under this research agreement, the Company incurred total costs of €20,000 (or ~$23,500 USD).

92. Then, in January 2021 and April 2021, the Company entered into two separate Collaborative Research Agreements with VivaCell. For the years ended December 31, 2023 and 2022, Skye incurred and paid in full $0 and $87,927, respectively, in expenses under the Collaborative Research Agreements.

93. On October 11, 2021, Skye entered into an Exclusive Sponsored Research Agreement (the "ESRA") with VivaCell to fund certain research and development programs. For the years ended December 31, 2023 and 2022, Skye incurred $50,000 and $200,000 in expenses under the ESRA. As of December 31, 2023 and 2022, the Company recognized accounts payable of $0 and $50,000, respectively. Skye terminated the ESRA on May 8, 2023, effective March 31, 2023.

94. Finally, on March 1, 2022, Skye entered into a research project with VivaCell for the development of a screening platform for anteroposterior ocular diseases. The project budget was reportedly set at $190,500. For the year ended December 31, 2023 and 2022, Skye incurred $39,167 and $167,000, respectively. As of December 31, 2023 and 2022, the Company recognized $0 and $7,835, respectively, in other current liabilities - related parties related to the first research project. As of December 31, 2023 and 2022, the Company recognized $0 and $47,001, respectively, in accounts payable - related parties under this agreement.

3. *Sciences' "Independent" Contractor Fees and Expenses*

95. On February 1, 2018, the Company entered into an Independent Contractor Agreement with Sciences, pursuant to which the Company agreed to reimburse Sciences for expenses incurred in the performance of agreed upon services including, *inter alia*, corporate advisory services and technical expertise in the areas of business development, marketing, investor relations, information technology and product development. The Independent Contractor Agreement had an initial term of ten years and specified compensation to be agreed upon between the Company's CEO (Dr. Murphy) and Sciences' CEO (Dr. Avtar Dhillon) on a month-to-month basis. The fee due under this agreement was payable on a monthly basis; however, if we were unable to make payments due to insufficient funds, then interest on the outstanding balance is accrued at a rate of 12% per annum, calculated semi-annually.

96. Under this agreement, the Company incurred expenses of $542,000 and $550,000 during the years ended December 31, 2019 and 2018, respectively. For the fiscal year 2018, Dr. Avtar Dhillon individually received $45,000 under the Independent Contractor Agreement. This is in addition to the $117,890 and $22,885 Dr. Avtar Dhillon received as director compensation from the Company for the years ended December 31, 2019 and 2018, respectively.

97. As of December 31, 2019, the Company accrued $10,000 in expense under this agreement. The Independent Contractor Agreement with Sciences was terminated effective December 31, 2019.

98. On December 19, 2019, the Company entered into an Independent Contractor Services Agreement with Dr. Avtar Dhillon, pursuant to which Dr. Avtar Dhillon was to provide ongoing corporate finance and strategic business advisory services to the Company. In exchange for his services, Dr. Avtar Dhillon received a monthly fee of $10,000 with (i) $5,000 paid each month and (ii) $5,000

accruing from the effective date and payable upon the Company's completion of a material financing.

99. On March 30, 2020, the Company amended the Independent Contractor Services Agreement by agreeing to defer payment of 100% of Dr. Avtar Dhillon's consulting fees until the Board determined that the Company had been sufficiently financed to make such payments at which point we would pay Dr. Avtar Dhillon all his accrued consulting fees, and a bonus of 10% of his accrued consulting fees, less applicable tax and other withholdings.

100. The deferral was paid concurrent with the Company's registered public offering closed on August 4, 2020 (the "August 2020 Financing") pursuant to which it received $6,113,969 in net proceeds and upon which the Board determined the Company had been sufficiently financed to make such payments. After the August 2020 Financing, Dr. Avtar Dhillon continued to receive a monthly fee of $10,000 until the agreement's termination, effective October 14, 2021.

101. Under this agreement, for the years ended December 31, 2021, 2020 and 2019, the Company incurred fees of $94,516, $127,387, and $3,871, respectively. As of December 31, 2021 and 2020, the Company accrued $20,000 of consulting fees and $7,032 in expense related to the Independent Contractor Services Agreement, respectively.

102. In connection with the termination of Dr. Avtar Dhillon's Independent Contractor Agreement on October 14, 2021, the Company also modified Dr. Avtar Dhillon's option awards to accelerate the vesting of 6,600 unvested stock options and, extend the post-termination exercise period from 30 days to five years for all of his outstanding awards.

*4. <u>The Company's Acquisition of Therapeutics</u>*

103. While the Emerald Group faced scrutiny in the U.S. with the DOJ and SEC, on November 29, 2021, Therapeutics, the now-defunct Vancouver-based public company under the Emerald Group, announced its plans to pivot out of the

medical cannabis business and into pharmaceutical development (*i.e.,* Skye) to "maximize its cash position and seek business opportunities in pharmaceutical development where the Board of [Therapeutics] has significant expertise."

104. At the time, Therapeutics' board included Jim Heppell as Chairman, and Punit Dhillon as a director (from June 2019 until November 2022).

105. As later described in the plan of arrangement, on October 26, 2021, Skye's CEO, Punit Dhillon, met with the Board (which also included Mr. Heppell) in the Company's standard quarterly board meeting and discussed the merits and strategic rationale for a potential transaction with Therapeutics.

106. On February 28, 2022, Skye entered into a consulting agreement with Maheep Dhillon to assist with diligence on the Therapeutics acquisition "due to his knowledge and expertise as a former executive of [Therapeutics]." Maheep Dhillon was Vice President of Corporate Development at Therapeutics from December 2019 until May 2021. As a consultant for Skye in connection with his diligence review for the Therapeutics acquisition, the Company paid Maheep Dhillon $94,282.

107. On May 11, 2022, Skye and Therapeutics announced that they had entered into an plan of arrangement under the Business Corporations Act whereby Skye would acquire all of the issued and outstanding shares of Therapeutics in exchange for 1.95 of a share of Skye common stock, with approximately 1,664,000 shares of Skye common stock expected to be issued to Therapeutics shareholders, and Skye would acquire all of Therapeutics' cash (~$16 million as of March 31, 2022) and non-cash assets.

108. On May 18, 2022, Mr. Heppell resigned from the Company's Board and concurrently entered into the consulting agreement with Skye under which he was entitled to a monthly fee of $6,300, which was increased to $16,600 per month upon the closing of the Therapeutics acquisition. Pursuant to the consulting agreement, Mr. Heppell also received a termination payment of $74,700 on March

1, 2023, equal to the monthly fees through the then-remaining term of the agreement. In total Mr. Heppell received approximately $167,450 from Skye as consultant in connection with the Therapeutics acquisition.

109. This is in addition to the $24,069 Mr. Heppell received as director compensation from the Company for the year ended December 31, 2022. For comparison, for the years ended December 31, 2018, 2019, 2020, and 2021, Mr. Heppell received $34,804, $60,000, $83,527, and $96,179, respectively, for his services as a member of the Company's Board of Directors.

110. Mr. Heppell was also awarded 16,000 stock options which included a combination of performance and other vesting conditions pursuant to his consulting agreement with the Company. In pertinent part, the vesting conditions of the stock option award provided that 50% of the options were vested upon grant.

111. According to the companies, the cash received from the Therapeutics acquisition was to be used to fund Skye's operations through the clinical trials of its then-lead product candidate, NB1111, which were then-slated to begin in 2022.

112. Skye has incurred operating losses and negative cash flows from its operations since inception. The Company did not expect to receive any revenue from its lead drug candidate(s) until it obtained regulatory approval and achieved commercialization. To date, Skye has not generated any revenue. As a result, the Company has, at all relevant times, relied on the issuance of equity securities, borrowings from a related party, and strategic transactions to fund its operations.

113. As detailed above, the Company effected three drawdowns under the October 2018 Credit Agreement with Defendant Sciences, each in the amount of $2,000,000, for an aggregate principal amount of $6,000,000 in advances, and issued Sciences 30,000 warrants.

114. On December 20, 2019, the Company entered into a Warrant Exercise Agreement with Sciences, pursuant to which Sciences exercised 163,200 warrants and paid the aggregate exercise price of approximately $4,080,000 for the related

warrant shares in the form of a reduction of the corresponding amount of obligations outstanding under the Credit Agreement. Upon consummation of the transactions under the Warrant Exercise Agreement, the total outstanding principal amount excluding discounts under the Credit Agreement was $2,014,500.

115. Then, on April 29, 2020, the Company entered into an Amended and Restated Multi-Draw Credit Agreement (the "Amended Credit Agreement") with Sciences allowing for warrants issued after to have a reduced exercise price. Further, advances under the Amended Credit Agreement were convertible into shares of common stock at a reduced fixed conversion price. The amendment also removed the change in control provision as an event of default for advances before and after the amendment and Sciences agreed to defer all interest accrued and/or due under agreement, until Skye completed a capital raise of at least $5,000,000.

116. During the second quarter of 2020, the Company effected the fourth and fifth advances under the Amended Credit Agreement in the amounts of $150,000 and $300,000, respectively. Sciences elected that the fourth and fifth advances would not be convertible into shares and that no warrants would be issued with the advances.

117. On March 29, 2021, the Company and Sciences entered into a second amendment to the Amended Credit Agreement to defer interest payments through the earlier of maturity or prepayment of the principal balance. And on September 15, 2021, the parties further amended the Amended Credit Agreement to close the Company's access to any further disbursements. As of September 30, 2021, the Company had an outstanding principal balance of $2,464,500 under the Amended Credit Agreement, with a maturity date of October 5, 2022.

118. Accordingly, based on Skye's then-reported expected cash requirements, without obtaining additional funding by September 2022, management reportedly believed that the Company would not have enough funds to continue its clinical studies and pay down its related party debt to Sciences.

119. Shareholders of Therapeutics voted in favor of the arrangement with Skye on August 19, 2022, and the Supreme Court of British Columbia issued a final order approving the arrangement on August 25, 2022.

120. Despite receiving a final order on the arrangement in August, the deal suffered from "transactional delays" pushing the close date beyond what was initially set. Due to these reported delays, on October 17, 2022, Skye and Therapeutics entered into a loan agreement pursuant to which Therapeutics loaned Skye $700,000 to be used for general working capital purposes.

121. Then, on November 10, 2022, Therapeutics announced that the arrangement had closed and that it has entered into agreements to divest its remaining cannabis assets and licenses, including its Quebec cannabis production facility which sold for $9.48 million.

122. Upon closing the Therapeutics acquisition on November 10, 2022, Skye acquired net assets with an estimated fair value of $15,045,412 and received $6,784,057 in cash, and upon the closing of a Therapeutics subsidiary disposition, Skye received an additional payment of $5,547,000 on February 10, 2023.

123. After the Therapeutics acquisition closed, Skye stockholders owned approximately 54% of the common stock of Skye and former shareholders of Therapeutics owned approximately 46%.

124. Less than a week later, on November 17, 2022, Skye entered into an amendment to the Amended Credit Agreement, by and between Sciences and Skye, pursuant to which (i) Skye agreed to prepay 25% of the outstanding principal amount, equal to $616,125, plus all accrued interest of $328,737 (ii) the parties agreed to extend the maturity date from October 5, 2022 to the earlier of December 30, 2022 or the termination date, and (iii) the parties agreed to amend the exercise price of the warrants to purchase common stock held by Sciences.

125. Then, on February 16, 2023, the Company and Sciences entered into a Master Transaction Agreement (the "MTA"), under which Sciences agreed to

exercise 66,566 common stock warrants (the "MTA Warrants"). Under the MTA, the parties agreed that the aggregate proceeds from the exercise of the MTA Warrants of $282,905 was to be paid through a reduction of the Amended Credit Agreement owed by the Company to Sciences.

126. The remaining principal balance of $1,597,236 under the Amended Credit Agreement was converted into 165,517 shares of common stock of the Company. In connection with the induced conversion, the Company recorded a debt conversion inducement expense of $1,383,285 equal to the fair value of the incremental shares issued upon conversion.

127. On February 22, 2023, the Company issued 66,566 shares of common stock to Sciences in connection with the exercise of the MTA Warrants.

128. Following the issuance of shares described above, the Amended Credit Agreement was terminated in its entirety under the terms of the MTA.

129. Additionally, the MTA contemplated for Sciences "to use its best efforts" to transfer all of the common stock of the Company held by Sciences to its shareholders on a pro-rata basis at or immediately prior to the Company's listing to a nationally recognized stock exchange.

* * *

130. Accordingly, as seen with Therapeutics, Pharmaceuticals, and VivaCell before it, between 2018 and 2023, the Company engaged in numerous transactions creating a circular cash flow in the Emerald Group.

131. During this time, the Company paid other Emerald entities and Company insiders a total of $2,162,553 in consulting fees and other expenses.

132. Further, while on paper the Company borrowed $6.45 million from Sciences between 2018 and 2023, its debts were paid back in total cash payments of $944,862 and 395,283 shares of common stock issued in connection with exercised warrants by Sciences. These cash payments to Sciences were made less than a week after the Company received nearly $6.8 million in cash in connection

with the Therapeutics acquisition – a transaction that resulted in Therapeutics' shareholders (like Defendant Dhillon), receiving approximately 1,664,000 shares of Skye common stock.

**F. <u>The First Pump Attempt – Clinical Development of NB1111</u>**

133. With both Therapeutics and Pharmaceuticals under fire and on the brink of dissolution, Defendants turned their attention to Skye as the Emerald Group's next well to run dry, filled by its unsuspecting retail investors.

134. As set forth below, Defendants engaged in a fraudulent pump-and-dump scheme and course of business to boost the value of its product candidate portfolio – its most important metric – and thus, its stock price for the purpose of selling shares at an artificially inflated price. Unbeknownst to investors, Defendants carried out their pump-and-dump scheme through the concealed methods identified below.

*1. <u>Pre-Clinical Non-Human Studies of NB1111</u>*

135. Between 2013 and 2019, the Company, in partnership with UM, completed several preclinical studies of NB1111 using an accepted animal model.

136. In 2013 and 2014, UM conducted studies of the formulation in the rabbit ocular model which, according to Skye, showed that the molecule was able to penetrate all chambers of the eye. The Company also reported that these studies revealed that the formulation was able to achieve potentially therapeutic concentrations in the anterior compartment, vitreous humor, and posterior compartment of the normal rabbit eye, which is very similar to the human eye in anatomy and physiology.

137. Additional studies using an alpha-chymotrypsin induced glaucoma model in rabbits were performed by UM in 2013 and 2014 under a grant from the National Institutes of Health (the "NIH"). The Company reported that those studies showed that NB1111 was able to reduce IOP by 45% to 50%. According to Skye,

reduction in IOP was successful in an almost linear dose-responsive manner, with greater decline in IOP associated with higher dosage concentration.

138. In late 2015 and 2016, UM conducted studies to examine the delivery system of the drug to prolong the drug's biologic half-life using topical drop administration. Specifically, UM placed NB1111 into a solid lipid-nanoparticle system ("SLN") which was then administered to rabbits that underwent elevated IOP inducement using the alpha-chymotrypsin model. According to the Company, data from that experiment confirmed previous studies that showed administration of NB1111 resulted in a 45% reduction in IOP from baseline with a half-life consistent with five to six-times per day dosing. When NB1111 was administered via SLN delivery, the lower concentration of NB1111 (0.4% equivalent THC) exhibited a decrease in IOP of approximately 20% while the higher concentration of NB1111 (0.6% equivalent THC) lowered IOP by a maximum of 38%.

139. Further animal experimentation conducted in 2016-2017 examined both the penetration and concentration of NB1111 in key organs of the eye. According to the Company, the data from that experiment revealed that IOP declined in a concentration-time dependent manner and could be correlated to the concentration of THC in organs regulating IOP, such as the trabecular meshwork in the anterior compartment and the retina-choroid in the posterior compartment.

140. Skye claimed this data was important for demonstrating a direct causal relationship between the penetration and concentration of THC with IOP-lowering capability and the presence of THC in multiple compartments of the eye. Additionally, neither free-THC nor 11-hydroxy-THC (the main active metabolite of THC) was detected in the peripheral circulation of the test animals, indicating that the topical dosage of the test compound remained restricted to the eye.

141. In August 2018, the Company entered into a research agreement with UM to conduct an animal study designed to assess the efficacy of NB1111 in lowering IOP when compared to the prostaglandin-based therapy, latanoprost, the

then-current standard-of-care for treating glaucoma. The original term of agreement extended through January 31, 2019. In February 2019 the term was extended through May 31, 2019.

142. On May 10, 2019, when reporting its financial results for the quarter ended March 31, 2019, the Company declared various milestones achieved related to the research and development of NB1111 including that, GM had completed its experiments showing that NB1111 was statistically superior in lowering IOP when compared to the then-current standard-of-care for treating glaucoma, across multiple timepoints during a seven-day course of repeated dosing using a validated rabbit normotensive ocular model.

### 2. *Pre-Clinical Studies of NB1111 Using Human Tissue*

143. In November 2018, under Emerald's control, the Company retained Glauconix Biosciences Inc. ("Glauconix") to research the mechanism of action and IOP-lowering ability of THC when exposed to the 3D-human trabecular meshwork tissue constructs (3D-HTMTM) using both healthy and glaucomatous-derived tissues. The expected term of the study was approximately 12 weeks.

144. From March 2019 through March 2021, the Company publicly declared numerous times that the Glauconix study validated the mechanism of action of NB1111 in lowering IOP.

145. However, the complaint filed on April 16, 2021, by Whitney Cunning, the Company's former Vice President of Business Operations (from March 2018 to July 2019), alleging, among other things, wrongful termination, violation of whistleblower protections under the Sarbanes-Oxley Act of 2002 and retaliation under California law (the "Cunning Lawsuit"), revealed Glauconix had rather determined that additional testing would be needed to confirm the effectiveness of the treatment and how NB1111 effected diseased tissue based on the study's results. Specifically, Glauconix based this determination on the indication that one

of the just ***three*** glaucomatous-induced 3D-HTMTM samples tested did not respond to any of the THC treatment.

146. Following the filing of the Cunning complaint, the Company made no public mention of the Glauconix study again. Notwithstanding, it pushed forward to clinical development of NB1111.

*3. Phase I Clinical Trial of NB1111*

147. When the Company initially discussed conducting a Phase I clinical trial of NB1111, the trial was expected to begin in the second half of 2020 in Australia and was to be conducted in both normal subjects and patients with glaucoma or ocular hypertension.

148. Then, the Cunning Lawsuit was filed calling into doubt the clinical prospects of NB1111, while at the same time undisclosed scrutiny by the SEC and DOJ of the Emerald Group and its insiders intensified. During this time, the Company publicly blamed the COVID pandemic, pushing the start date of the Phase I clinical trial of its lead product candidate to Q3 2021 and then to Q2 2022.

149. Then, during Q2 2022, around the same time Pharmaceuticals and its leadership received the "Wells Notice" from the SEC, the Company claimed to have been indirectly impacted by a cyberattack on the contract manufacturer for its Phase I trial, pushing the initiation date to Q4 2022.

150. The Company finally commenced enrollment of the Phase I clinical trial of NB1111 in November 2022 and began dosing patients in December 2022.

151. The Company completed the planned enrollment of the Phase I trial of NB1111 in June 2023, with results announced in October 2023.

152. Specifically, on October 25, 2023, the Company issued a press release entitled, "*Skye Bioscience Announces Positive Phase 1 Trial Results for SBI-100 Ophthalmic Emulsion, Its First-in-Class CB1 Agonist Being Developed for the Treatment of Glaucoma*." The press release revealed, however, that as completed, the Phase I clinical trial was conducted only on healthy participants, assessing the

safety and tolerability of NB1111 as well as its pharmacokinetics – or how the body interacted with the drug over time – but not efficacy.

153. When announcing the results of this Phase I trial, Punit Dhillon focused attentions on the purported positives gathered from the data collected claiming, "hyperaemia is a common side effect of anti-glaucoma therapy and is a major reason for patients discontinuing treatment with prostaglandin analogues," while reporting that only "[o]ne of 24 (4.2%) healthy volunteers in the single ascending dose ('SAD') arm and 2 of 24 (8.4%) in the multiple ascending dose ('MAD') arm of the SBI-100 OE study experienced hyperaemia, or red eyes."

154. The Company went on to report that while there were reports of "[d]iscomfort/pain upon administration of SBI-100 OE … any discomfort was transient and resolved on average in less than 15 minutes" and indicated that "[n]o study participants dropped out due to SBI-100 OE." Such findings supported the Company's claim that "SBI-100 OE was deemed safe, well-tolerated, with no drug-related serious adverse events and treatment-related adverse events were consistent with topically-applied eye treatments."

155. With regards to the Phase I study's findings relating to the drug's pharmacokinetics, the Company reported that, "[w]hile SBI-100 OE was detected systemically, with exposures increasing with increasing concentrations of drug, no THC, the active pharmaceutical ingredient of SBI-100 OE, or its more psychoactive metabolite, 11-OH-THC, were detected in the plasma across all cohorts, except one patient in the 1.0% SBI-100 OE cohort." According to the Company, the "[l]ack of THC and 11-OH-THC detected in plasma support the minimal systemic side effects observed."

156. Most notably, however, was the fact that "[n]o differences were observed in reducing IOP between placebo and active." The Company tried to downplay these results claiming, "[t]he lack of meaningful reduction in IOP is possibly due to the low average baseline IOP in both groups." Further, Tu Diep,

Skye's Chief Development Officer ("CDO"), is quoted in the press release as saying, "meaningful reductions of intraocular pressure using IOP-lowering drugs are not generally expected in healthy populations." That said, he went on to describe a subgroup analysis of study participants in the MAD arm with a higher baseline IOP, defined as 17mmHg or greater, of which "[f]ive of the 18 participants who were administered SBI-100 OE met this criteria," and indicated that "[t]hese study participants experienced a reduction in IOP ranging from 14%-31%, with a mean reduction of 23%." However, he also revealed that "[o]ne participant with higher baseline IOP receiving placebo experienced IOP-lowering of 14%."

157. In sum, the Company declared the results of this Phase I study "an encouraging outcome for the future of this program" highlighting that "[o]bserving an incidence of hyperaemia below 10% could be a very important differentiating characteristic compared to competitive glaucoma drugs" and "the lack of systemic side effects and generally nominal discomfort is very favorable." With respect to the evaluation of IOP, Tu Diep claimed that the Company's "primary goal was to monitor for increases in pressure resulting from drug administration to ensure the safety of our patients, and in this regard we did not see any increases in IOP."

*4. Phase II Clinical Trial of NB1111*

158. Concurrently with the Company's activities in Australia, in December 2022, Skye announced receiving FDA clearance of its Investigational New Drug ("IND") application allowing the Company to conduct clinical studies of NB1111 in the U.S. and clearing its path to commence a Phase II trial to test the drug's efficacy without first completing the Phase I study.

159. The Phase II clinical trial of NB1111 was a double-masked, randomized, placebo-controlled study, including 56 patients with primary open-angle glaucoma or ocular hypertension. The primary objective was to evaluate the safety and effectiveness of two dose levels of NB1111 compared to placebo in patients with elevated IOP. While not yet complete, the Company reportedly chose

dosing based on data from the Phase I study, selecting 0.5% and 1.0% concentrations of NB1111 for the active arms of the Phase II trial versus placebo.

160. As of March 2023, the Company reportedly expected the Phase II trial of NB1111 to begin "in the middle of 2023." Due to some reported permitting delays, however, the initiation date was pushed to Q3 2023 with the first patient dosing expected in early Q4 2023.

161. By November 2023, the Company claimed that interim analysis of IOP data was expected to be reported in the first half of 2024 following study completion of 50% of treated patients.

162. Then, on February 26, 2024, Skye announced that targeted enrollment was completed ahead of schedule. According to Skye's CDO, Tu Diep, "[b]ecause this trial completed enrollment ahead of schedule, our initially intended interim data report based on partial enrollment is unnecessary. We are now focused on database lock activities to have topline data for all treated patients available in Q2."

### G. <u>The Cunning Lawsuit Derails Defendants' First Pump Attempt</u>

163. Despite receiving an influx of cash related to the Therapeutics acquisition, Skye continued to operate on a deficit basis. As of March 31, 2023, Skye had a working capital deficit of $4,916,609 and an accumulated deficit of $71,905,285. At the same time, it had just $2,668,697 in unrestricted cash.

164. On January 18, 2023, a jury rendered a verdict in the Cunning Lawsuit, in favor of Ms. Cunning and against the Company, and awarded her $512,500 in economic damages (e.g., lost earnings, future earnings and interest), $840,960 in non-economic damages (e.g., emotional distress) and $3,500,000 in punitive damages.

165. Based on Skye's expected cash requirements, without obtaining additional funding by the second half of 2023, it did not expect to have enough funds to continue its clinical studies or meet its financial obligations. These conditions, including the uncertainty of its ability to successfully resolve the

Cunning lawsuit, led to substantial doubt as to Skye's ability to continue as a going concern within one year.

166. On August 2, 2023, the district court ruled on Ms. Cunning's motion for attorney fees and awarded her $1,200,008. At the same time, the district court granted the Company's request for a stay of enforcement of the final judgment pending post-trial motions and appeal conditioned on the Company posting a bond in the amount of $9,080,202 by August 10, 2023.

### H. <u>The Successful Pump by Acquisition of Nimacimab</u>

#### *1. <u>The Scheme Funded by More of the Same Related Parties</u>*

167. With cash supplies being swiftly depleted and legal battles and fees mounting, Defendants devised a plan to generate significant interest in the Company and portray a financially stable business with outsized product potential just long enough for insiders to squeeze out any last dollars to be had.

168. On August 21, 2023, Skye announced that it had raised $17 million in new capital consisting of $12 million obtained via a PIPE financing led by entities affiliated with 5AM Ventures and entities affiliated with Versant Ventures (each partnered by Andrew J. Schwab, a director of Bird Rock Bio Inc., and Paul Grayson, CEO of Bird Rock Bio Inc., respectively), and $5 million obtained via a short-term convertible note with MFDI (an entity controlled by Baldev K. Munger and Kewel K. Munger).

169. The August 2023 PIPE financing also included the cancellation and conversion of a $250,000 bridge loan entered into and between the Company and MFDI on July 24, 2023, "to provide bridge financing for the business to secure additional strategic financing."

170. Concurrent with this announcement, Skye reported using $9 million of its newfound capital to secure the appellate bond in the Cunning Lawsuit.

171. Skye also announced the acquisition of 100% of the outstanding capital stock of Bird Rock Bio, Inc. for total consideration of approximately $20

million which was payable to Bird Rock Bio Inc. stockholders solely in shares of Skye common stock.

172. In connection with the August 2023 PIPE financing and the acquisition of Bird Rock Bio, Inc., Skye issued 581,383,799 shares of its common stock at a price of approximately $0.021 per share and 557,159,474 common shares to the existing preferred shareholders of Bird Rock Bio, Inc. that participated in the PIPE financing. In addition, the PIPE investors were granted 581,383,799 warrants with an exercise price of approximately $0.021.

173. Messrs. Grayson and Schwab were also appointed to serve as Directors of the Company. In connection with Mr. Grayson's appointment to the Board of the Company, Skye paid Mr. Grayson a cash bonus of $350,000 on September 18, 2023.

174. Following the Company's August 2023 PIPE financing and Bird Rock acquisition, ownership and control of Skye *appeared* to dramatically shift. As of March 31, 2023, Sciences was the Company's majority shareholder, owning 17.4% of the Skye's issued and outstanding common stock. The following sets forth each person known to own beneficially five percent (5%) or more of the outstanding shares of Skye common stock as of September 29, 2023:

- Entities affiliated with 5AM Ventures owned 6,228,823, or 44.4%
- Entities affiliated with Versant Venture owned 2,530,950, or 19.7%
- MFDI owned 1,580,524, or 11.5%
- Apposite Healthcare Fund LP owned 694,739, or 5.6%
- GSK Equity Investments, Limited owned 694,739, or 5.6%
- Emerald Health Sciences, Inc. owned 677,633, or 5.5%

175. As noted above, MFDI is entity controlled by Baldev K. Munger and Kewel K. Munger, who are relatives by marriage of Dr. Avtar Dhillon. The Mungers also own Munger Farms of which Robert E. Hawk serves as CEO. Mr. Hawk also serves as Chairman and acting CEO of Sciences since January 2023;

and served as a Director of Pharmaceuticals from August 2022 until its dissolution in March 2023. Further, MFDI is a controlling shareholder of Sciences.

176. On September 7, 2023, Skye announced a 1-for-250 reverse stock split of its issued and outstanding common stock, effective September 8, 2023. Following the reverse split, the Company's total number of shares of common stock authorized were reduced from 5,000,000,000 to 20,000,000 and the number of shares issued and outstanding were reduced from approximately 3,078,137,871 common shares to approximately 12,312,551 common shares.

### 2. *Clinical Development of Nimacimab Under a New Indication*

177. Through the acquisition of Bird Rock, Skye acquired nimacimab. Nimacimab was originally evaluated in a Phase I clinical study for the treatment of nonalcoholic fatty liver disease ("NAFLD"), completed by Bird Rock in 2017.

178. In Part A of this Phase I study, 24 healthy volunteers were randomized to receive a single dose of either placebo or single ascending doses of nimacimab (0.6, 1.2 or 2.5 mg/kg). In Part B, 82 patients with pre-diabetes or diabetes and NAFLD were randomized to receive either placebo or multiple escalating doses of nimacimab (0.6, 1.2 or 2.5 mg/kg) once a week for four weeks.

179. Following the completion of this Phase I clinical study, Bird Rock shelved the product – meaning it did not continue to pursue clinical development or commercialization of nimacimab for any indication.

180. After the acquisition by Skye, on December 11, 2023, the Company announced its plans to reengage clinical development of nimacimab but under a different development strategy for weight loss and the treatment of obesity.

181. Skye justified the strategic shift providing, "the role of CB1 as an important regulator of appetite/satiety and diabetic renal complications has been demonstrated preclinically as well as clinically with a number of small molecule inverse agonists/antagonists. However, their efficacy has been hampered by mechanism-based safety issues related, in particular, to side effects of the central

nervous system ('CNS'). Nimacimab effectively inhibits CB1 signaling and, based on preclinical and early clinical studies, is devoid of the CNS liabilities typically seen by small molecule drugs that target the CB1 receptor because it does not cross the blood-brain barrier."

182. That same day, Skye announced the filing of an Investigational New Drug ("IND") application with the FDA for the initiation of a Phase II clinical study of nimacimab in patients with obesity and chronic kidney disease.

183. According to Skye, nimacimab had competitive advantages that differentiate it within the CB1 inhibitor class. First, as a monoclonal antibody, it is a large molecule that, according to Skye, has great difficulty crossing the blood-brain barrier and restricts its engagement to CB1 receptors present in tissue/organs within the periphery of the body (i.e., outside the brain). Second, it is a negative allosteric modulator, a unique binding mechanism compared to small-molecule CB1 inhibitors, which, according to Skye, had the potential to confer advantages in terms of its therapeutic index. In particular, Skye claimed that nimacimab shares many of the characteristics of small molecule inverse agonists by targeting CB1 receptors in adipose tissue to directly increase fat metabolism and indirectly impact hunger hormones. However, Skye believed its virtually complete restriction to the periphery eliminates problematic central engagement in the brain. In the case of small-molecule CB1 inhibitors, CB1 inhibition in the brain has been associated with dose-dependent neuropsychiatric adverse events.

184. The Company went on to declare that "[e]ncouraging trends were observed in exploratory biomarkers of cholesterol, liver enzymes and liver function in patients receiving nimacimab versus placebo [in the Phase 1 trial]. Moreover, pharmacokinetic assessment of nimacimab highlighted a half-life of approximately three weeks, potentially allowing for monthly dosing."

185. Skye's CDO, Tu Diep, is quoted in the Company's December 11, 2023 press release as saying, "[t]he promising PK data from the Phase 1 study

suggests that nimacimab can be dosed once-a-month subcutaneously, which we believe would be a significant competitive advantage over once-a-week subcutaneous dosing of the current peptidic GLP-1 receptor agonists or even orally dosed GLP-1 receptor agonists due to their less desirable tolerability profile."

186. On January 9, 2024, Skye announced that it had received clearance of its IND application with the FDA to initiate a Phase II clinical trial of nimacimab in patients with obesity and chronic kidney disease.

187. Then, on January 29, 2024, Skye announced a $50.25 million PIPE financing co-led by life sciences-focused investor and 5AM Ventures, with participation from other institutional investors. Followed by an additional $40 million PIPE financing on March 11, 2024, funded by some of the same investors.

188. Skye's IND clearance and large amounts of financing obtained drew the attention of market analysts and investors alike. For example, on February 4, 2024, Piper Sandler initiated coverage of Skye at $12 per share highlighting the company's development of the "peripherally-restricted CB1 antibody nimacimab to treat obesity by restoring leptin sensitivity and increasing fat metabolism," noting, "[w]e believe this mechanism is validated by Novo Nordisk's recent acquisition of privately-held Inversago for $1.075 billion. Skye plans to initiate a Phase II study of nimacimab +/- semaglutide in obese patients in mid'24 with data in 2025. We believe Skye's approach of developing an antibody with muscle-sparing weight loss and no psychiatric AEs offers blockbuster potential."

189. Then, on April 11, 2024, Skye successfully uplisted to the NASDAQ from the OTCQB. On September 11, 2023, the first trading day after the Company's 1-for-250 reverse stock split, the price of Skye common stock closed at $2.50 per share. By the time of the Company's uplisting on April 11, 2024, the price of Skye common stock closed at $12.69 per share.

190. On June 10, 2024, Skye announced its decision to direct all clinical development resources to its metabolic program, following the news that the Phase II clinical trial of SBI-100 OE did not meet its primary endpoint for lowering IOP.

191. On August 22, 2024, Skye announced that it had started screening patients for the Phase II clinical trial, referred to as "CBeyond" (ClinicalTrials.gov: NCT06577090), of its novel peripheral CB1 inhibitor, nimacimab. The study was designed to assess the ability of nimacimab as a next-generation weight loss therapeutic to safely and effectively reduce weight in patients with obesity. The primary endpoint of CBeyond was to demonstrate the difference in mean weight loss of 8% between the active nimacimab arm vs. placebo.

192. At all relevant times, the Company maintained that central targeting of CB1 inhibition is not required for meaningful efficacy. To demonstrate this, Skye developed a diet-induced obesity (DIO) model using humanized mice with knock-in CB1 receptors to interrogate the in vivo efficacy of nimacimab, a humanized IgG4 anti-CB1 antibody.

193. On November 4, 2024, Skye shared initial data from its DIO study with nimacimab showing dose-dependent weight loss as well as positive changes in body composition and glycemic control upon treatment. Skye represented that this data supported its belief that "true peripheral CB1 inhibition can positively impact metabolic disorders including obesity."

194. The market reacted positively to this news. For example, the analyst group, Oppenheimer, issued a report that same day rating the Company to "outperform" and setting its 12–18-month price target as $21.00 per share, declaring, "[w]e see SKYE's preclinical data showing nimacimab's efficacy on weight-loss in mice as further validating its peripheral CB1 antagonism MOA." The report went on to note that this data also addresses: "1) lack of prior data on weight-loss as nimacimab now shows significant preclinical efficacy signals that we expect to translate into clinically meaningful weight-loss; 2) complementary

profile to GLP-1 approaches with high quality weight-loss; and 3) differentiation vs. small molecules targeting CB1."

195. As with the Phase II clinical trial of SBI-100 OE, when the Company first announced CBeyond initiation, Skye provided that "[i]nterim data will be reported after 50% of enrolled patients have completed the treatment period" with "[f]inal data [to be] reported following completion of treatment and follow-up of all enrolled patients." In the same press release, Defendant Dhillon is quoted as saying, "we look forward to our goals of reporting interim data from this Phase 2 obesity trial in Q2 of 2025 and final data in Q4 of 2025."

196. According to Skye's Q3 2024 Form 10-Q, filed with the SEC on September 30, 2024, CBeyond continued to enroll patients, and as such, the Company "expect[ed] to meet [its] goal of 50% enrollment by the end of 2024" and "to provide interim and topline data in the second and fourth quarters of 2025."

197. While CBeyond was ongoing, Skye continued to tout nimacimab's purported "differentiated" mechanism of action and potential efficacy results as purportedly supported by data generated from other preclinical and clinical studies. Critically, the Company cited to nimacimab's purportedly potent efficacy as observed in these various studies to suggest that the results of CBeyond were likely to be favorable, while consistently touting nimacimab's overall clinical, regulatory, and commercial prospects.

198. For example, on November 7, 2024, Skye issued a press release reporting the financial results for Q3 2024 results and providing recent business highlights noting, in relevant part, that "We also recently announced new preclinical data from a [DIO] model in mice. ***Nimacimab achieved significant dose-dependent weight loss of up to 16% compared to vehicle, highlighting the prominent role of peripherally-driven CB1 inhibition to induce weight loss and other metabolic benefits without relying on central CB1 inhibition and its risk of neuropsychiatric adverse events***." Based on these recent developments, Skye

declared, "***We believe our truly peripherally-restricted CB1 inhibitor has the differentiated attributes necessary to realize the unique benefits of this class of drug within the overall obesity landscape.***"

199. On November 14, 2024, Skye announced that it had achieved more than 50% of targeted patient enrollment for its CBeyond trial and expected to report interim data in "Q2 2025 after this initial set of enrolled patients has completed the 26-week treatment period."

200. Then, during the Company's Q4 2024 earnings call, held on March 20, 2025, Defendant Dhillon declared that "as of February 28, we have completed our enrollment with 136 patients, an over-enrollment from our originally planned 120 patients. And as a result of this accelerated over-enrollment, we now expect final top line data from all patients in late Q3 or early Q4. This is potentially 3 months earlier than our prior guidance, allowing us to forgo the originally planned interim analysis and instead report the full 26-week data ahead of schedule."

## I. <u>The Dump</u>

### *1. <u>The Company's Stock Incentive Plan</u>*

201. At all relevant times, the Company has maintained an employee stock incentive plan which authorizes the issuance of awards including stock options, stock appreciation rights, restricted stock units ("RSUs"), and performance units to employees, directors, and consultants of the Company.

202. On June 14, 2022, in connection with the Company's acquisition of Therapeutics, the Board (including Punit Dhillon as Chairman) approved the Amended and Restated 2014 Omnibus Incentive Plan (the "Restated Incentive Plan") which replaced, in its entirety, the Company's 2014 Omnibus Incentive Plan, approved on October 31, 2014.

203. The 2014 Omnibus Incentive Plan initially reserved 12,800 shares for future grants. In October 2018, the Company first amended the plan to increase the

share reserve to equal 10% of the number of issued and outstanding shares of common stock of the Company.

204. On August 7, 2020, the Company amended the plan for a second time to increase the share reserve by an additional 31,508 shares over the 10% of the number of issued and outstanding shares of common stock, and remove certain restrictions on the number of shares of common stock and the amount of cash-based awards up to which participants of the plan could receive in a calendar year.

205. As of December 31, 2020 and 2021, the Company had 51,163 and 56,532 shares, respectively, available for future grant under the 2014 Omnibus Incentive Plan.

206. The Restated Incentive Plan, effective September 30, 2022, among other things, fixed the number of shares that could be issued under the plan to 364,879, provided that each January 1 beginning in 2023 and ending on (and including) January 1, 2032, the number of shares will increase by 5% of the outstanding shares of common stock as of the prior December 31, unless the Board of the Company decides to a lesser increase.

207. On September 29, 2023, the Board approved an amendment to the Restated Incentive Plan to increase the aggregate number of shares of the Company's common stock authorized for issuance under the Plan to 1,846,883 shares of common stock, while retaining the automatic share replenishment feature which provided that each January 1 beginning in 2024 and ending in (and including) 2032, the number of shares will increase by 5% of the outstanding shares of common stock as of the prior December 31 of the preceding calendar year. Therefore, as of September 30, 2023, the Company had a deficit in the authorized share pool of 751,463 shares under the Restated Incentive Plan.

208. Then, on October 22, 2024, the second amendment to the Restated Incentive Plan was approved to, *inter alia*, increase the number of shares of common stock issuable thereunder by 1,535,655 shares, to increase the number of

incentive stock options that may be granted thereunder to 4,000,000, and extend the expiration date of the plan to September 10, 2034.

### 2. *Relevant Employee Awards Under the Incentive Plan*

209. Pursuant to the Company's stock incentive plan, on December 14, 2021, Skye granted 16,000 RSUs to its executive management team made up by Punit Dhillon (CEO) and Kaitlyn Arsenault (CFO) and as later reported, Tu Diep (CDO). The RSUs were to vest in three equal annual installments commencing on the first anniversary of the grant date – *i.e.*, on December 14, 2022, 2023, and 2024.

210. Pursuant to the Company's stock incentive plan, on August 25, 2023, Skye granted 842,445 RSUs to its executive management team and to certain members of the Board with market- and performance-based conditions. Such individuals included Punit Dhillon, Kaitlyn Arsenault, Paul Grayson (Director) and, as later reported, Tu Diep and Christopher Twitty (Chief Scientific Officer).

211. On August 22, 2024, the Board approved a modification to the terms of the RSUs approved on August 25, 2023, and September 29, 2023 to its executive management team and to a member of the Board. The fourth vesting condition was modified from a performance-based condition to a market-based condition since, according to the Company, the performance condition was improbable of being met at the time of the modification.

212. Finally, pursuant to its stock incentive plan, on February 29, 2024, the Company granted an additional 290,000 RSUs to its executive management team and to certain members of the Board with market-based vesting conditions.

213. During the year ended December 31, 2024, the Company released 634,664 RSUs pursuant to the Restated Incentive Plan, compared to 5,333 released during the years ended December 31, 2023 and 2022, respectively.

214. The Company reported 1,605 options exercised under employee incentive plans during the year ended December 31, 2024 at a weighted average exercise price of $3.50 per share. According to the Company, no options were

exercised under employee incentive plans during the year ended December 31, 2023. Likewise, none were exercised during the year ended December 31, 2025.

### 3. *Registration of Employee and Related Parties' Shares*

215. In the months leading up to and during the Class Period, Skye filed multiple Registration Statements on Form S-8 for the registration of securities for employees. In addition, the Company filed Registration Statements to sell shares held by the PIPE investors and other institutional investors, many of which constituted related parties. Skye did not receive any cash proceeds from any sale of the shares of Skye common stock sold under the following registration statements.

216. On December 22, 2023, Skye filed a Registration Statement on Form S-8 with the SEC for the purpose of registering 1,719,559 shares of common stock, par value $0.001 per share of the Company, issuable pursuant to the Restated Incentive Plan, and 112,000 shares of common stock, par value $0.001 per share of the Company, issuable pursuant to the Company's 2022 Employee Stock Purchase Plan (the "ESPP").

217. On March 27, 2024, Skye filed a Registration Statement on Form S-1 with the SEC, effective April 10, 2024, relating to the registration of up to a total 33,753,272 shares of common stock, par value $0.001 per share of the Company, consisting of: (i) 6,100,822 shares issuable pursuant to the Agreement and Plan of Merger and Reorganization, dated August 15, 2023 (the "Merger Agreement"); (ii) 2,325,537 shares issuable pursuant to that certain Securities Purchase Agreement, dated as of August 15, 2023, by and between the Company and the institutional investors (the "2023 Purchase Agreement"); (iii) 2,325,537 shares issuable upon the exercise of the warrants issued pursuant to the 2023 Purchase Agreement (the "2023 Warrants"); (iv) 968,973 shares issuable upon conversion of a secured convertible promissory note, dated as of August 15, 2023, by and between the Company and MFDI (the "MFDI Note"); (v) 340,000 shares issuable upon exercise of that certain warrant, dated as of August 15, 2023, by and between the Company

and MFDI (the "MFDI Warrant"); (vi) 11,713,664 shares issuable pursuant to that certain Securities Purchase Agreement, dated as of January 29, 2024, by and between the Company and the institutional investors identified therein (the "2024 Purchase Agreement"); and (vii) 9,978,739 shares issuable upon exercise of the pre-funded warrants (the "Pre-Funded Warrants" together with the 2023 Warrants and the MFDI Warrant, the "Warrants") issued pursuant to the 2024 Purchase Agreement.

218. As of November 12, 2023, there were 12,338,910 shares of Skye common stock issued and outstanding. Following the registration of employee shares on December 22, 2023, and effective registration of related parties' shares on April 10, 2024, there were 28,067,907 shares of Skye common stock issued and outstanding as of May 9, 2024.

219. On May 10, 2024, Skye filed a Registration Statement on Form S-3 with the SEC for the resale from time to time by the selling securityholders of up to 4,000,000 shares of common stock, $0.001 par value per share of the Company, issued pursuant to that certain Securities Purchase Agreement, dated as of March 11, 2024, by and between the Company and institutional accredited investors (the "Purchase Agreement"). Such selling securityholders included: (i) entities affiliated with 5AM Ventures VII, L.P; (ii) entities affiliated with Baker Bros. Advisors L.P.; (iii) Altium Growth Fund, LP; (iv) entities affiliated with Sphera; (v) Perceptive Life Sciences Master Fund, Ltd.; (vi) entities affiliated with Schonfeld Strategic Advisors LLC; (vii) Velan Capital Master Fund LP; (viii) Alyeska Master Fund, L.P.; (ix) Point72 Associates, LLC; (x) Citadel CEMF Investment LTD. (Ashler); and (xi) Laurion Capital Master Fund Ltd.

220. On August 8, 2024, the Company filed a Registration Statement on Form S-8 with the SEC for the purpose of registering an additional 617,462 shares of common stock issuable or which may become issuable under the Restated Incentive Plan and 80,016 additional shares of common stock under the ESPP.

221. As of August 8, 2024, there were 30,338,290 shares of Skye common stock issued and outstanding.

222. On November 7, 2024, the Company filed a Registration Statement on Form S-8 with the SEC for the purpose of registering an additional 1,535,655 shares of its common stock issuable under the Restated Incentive Plan.

223. On December 17, 2024, entities affiliated with 5AM Ventures VII, LLC and 5AM Partners II, LLC entered into a Stock Sale Plan (the "10b5-1 Plan") with Piper Sandler & Co. ("Piper Sandler"), pursuant to which Piper Sandler is authorized to sell up to an aggregate of 2,000,000 shares of Common Stock on behalf of the selling shareholders during the period beginning on the later of (i) March 17, 2025 and (ii) two business days after filing the Company's Form 10-K for the year ending December 31 (but no later than April 16, 2025), and ending December 17, 2025. As a reminder, Andrew Schwab, a member of the Board of Directors of the Company, is a managing member of each 5AM Partners VII, LLC and 5AM Partners II, LLC.

224. As of March 19, 2025, there were 30,974,558 shares of common stock issued and outstanding.

225. On March 20, 2025, the Company filed a Registration Statement on Form S-8 with the SEC for the purpose of registering an additional 1,548,728 shares of common stock issuable or which may become issuable under the Restated Incentive Plan and an additional 154,873 shares of common stock under the ESPP.

226. Notably, the Company's annual reports filed on Form 10-K with the SEC maintained that, as of December 31, 2022, 2023, and 2024, no shares were issued under the ESPP. Further, at no point during the Class Period, did the Company directly release new shares into the market.

227. As of May 6, 2025, there were 30,984,358 shares of Skye common stock issued and outstanding. As of August 5, 2025, there were 30,988,420 shares

of common stock issued and outstanding. As of November 7, 2025, there were 32,057,461 shares of common stock issued and outstanding.

*4. Dhillon's Misreported Holdings and Unaccounted for Sales*

228. In connection with Punit Dhillon's appointment as Director of the Company, on October 10, 2018, the Company granted Mr. Dhillon 800 stock options that were set to vest in equal monthly installments over a one-year period commencing on the date of the grant.

229. In connection with Punit Dhillon's appointment as CEO of Skye, on August 7, 2020, the Company granted Mr. Dhillon 36,000 stock options, with 10% of such options vested immediately upon grant and the remaining 90% vesting equally on each six-month anniversary of the grant date over the following four and a half years from the grant date.

230. On August 7, 2020, Punit Dhillon also claimed to have purchased 4,000 shares of Skye common stock through a private purchase transaction from Sciences for an aggregate purchase price of $100,000.

231. Accordingly, as of December 13, 2021, Punit Dhillon beneficially owned 15,600 shares of Skye which including (i) 4,000 shares of common stock; (ii) and 11,600 shares of common stock underlying unexercised vested options.

232. On December 16, 2021, Punit Dhillon filed a Statement of Changes in Beneficial Ownership with the SEC on Form 4 indicating that he received 8,000 of the 16,000 RSUs granted on December 14, 2021, as well as 12,360 stock options under the Company's stock incentive plan. The stock options were to vest 25% on the one-year anniversary of the grant date and 1/48th monthly thereafter.

233. On August 31, 2022, Skye filed a Schedule 14A Definitive Proxy Statement with the SEC indicating, in pertinent part, that as of August 29, 2022, Punit Dhillon beneficially owned 22,800 shares of Skye. Based on Mr. Dhillon's reported holdings, such shares included: (i) 4,000 shares of common stock; and (ii) 18,800 shares of common stock underlying unexercised vested options.

234. On November 15, 2022, Punit Dhillon filed a Statement of Changes in Beneficial Ownership with the SEC on Form 4 indicating that, on November 10, 2022, he (i) acquired 9,343 shares of common stock, held by a family trust of which Mr. Dhillon is the trustee, in exchange for Therapeutics shares held, pursuant to the terms of the plan of arrangement, dated May 11, 2022; (ii) directly acquired 5,626 shares of common stock in exchange for Therapeutics shares held by Mr. Dhillon, pursuant to the terms of the plan of arrangement, dated May 11, 2022; and (iii) directly acquired 6,240 stock options in exchange for Therapeutics stock options held, pursuant to the terms of the plan of arrangement, dated May 11, 2022, with all but 390 options fully vested and with the remainder vested as of February 6, 2023.

235. When reporting the Company's financial results for the year ended December 31, 2022 on Form 10-K filed with the SEC on March 31, 2023, Skye provided, in pertinent part, that, as of March 29, 2023, Punit Dhillon beneficially owned 55,658 shares of Skye which included (i) 9,343 shares of common stock held by a family trust of which Mr. Dhillon is the trustee; (ii) **12,293** shares of common stock held directly by Mr. Dhillon; (iii) 1,326 shares of common stock issuable upon exercise of warrants; and (iv) 32,696 shares of common stock underlying options that may be exercised within 60 days of March 29, 2023.

236. However, based on Punit Dhillon's prior reporting, this report indicates an additional ***1,334*** shares held directly by Mr. Dhillon that are unaccounted for under the only claimed purchase of 4,000 shares from Sciences, acquisition of 5,626 shares of Skye common stock in exchange for his Therapeutics shares, and award of 1,333 shares of common stock underlying the first of three equal installments of RSUs vested on December 14, 2022.

237. On August 30, 2023, Punit Dhillon filed an Amended Statement of Changes in Beneficial Ownership with the SEC on Form 4/A indicating that, as of August 29, 2023, he beneficially owned 112,079 shares of Skye which included:

(i) 9,343 shares held by a family trust of which Mr. Dhillon is the trustee; (ii) 21,626 shares held directly by Mr. Dhillon based on his: (a) existing **17,626** shares held directly by Mr. Dhillon as of this reporting; (b) acquisition of 36 shares common stock through a "small acquisition" occurring on August 23, 2023; (c) acquisition of 440 shares common stock through a "small acquisition" occurring on August 28, 2023; and (d) acquisition of 3,524 shares common stock purchased on an exchange or from another person on August 29, 2023; and (iii) 81,110 shares of common stock underlying RSUs awarded on August 25, 2023, pursuant to the Restated Incentive Plan.

238. In addition, Mr. Dhillon's Form 4/A indicated that on August 25, 2023, Mr. Dhillon was granted 9,013 stock options. The options were to vest in equal monthly installments over the four-year period beginning August 24, 2023.

239. When awarded on August 25, 2023, these RSUs carried the following vesting conditions: 25% vest upon achieving a market cap of $125M, an additional 25% vest upon achieving a market cap of $250M, an additional 25% vest upon achieving a market cap of $400M, and an additional 25% vest at an exit of $500M or greater. Notwithstanding anything to the foregoing, all RSUs were to vest if an exit greater than $500M was achieved at an earlier date. At the time of Punit Dhillon's reporting, none of the vesting conditions were met.

240. Based on Mr. Dhillon's prior reporting, this Form 4/A indicates an additional ***6,667*** shares held directly by him prior to recorded acquisitions that are unaccounted for under the only claimed purchase of 4,000 shares from Sciences, acquisition of 5,626 Skye shares in exchange for Therapeutics shares held, and award of 1,333 shares of common stock underlying the first of three equal installments of RSUs vested on December 14, 2022.

241. Then, on October 3, 2023, Skye filed a Preliminary Information Statement with the SEC on Schedule 14C providing, in pertinent part, that, as of September 29, 2023, Punit Dhillon beneficially owned 65,689 shares of Skye

which included: (i) 9,343 shares of common stock held by a family trust of which Mr. Dhillon is the trustee; (ii) **16,294** shares of common stock held directly by Mr. Dhillon; (iii) 1,326 shares of common stock issuable upon exercise of warrants; and (iv) 38,726 shares of common stock underlying options that may be exercised within 60 days of September 29, 2023.

242. Based on Mr. Dhillon's prior reporting, this Schedule 14C indicates an unaccounted-for reduction in Mr. Dhillon's direct holdings by ***5,332*** shares – *i.e.*, the difference between his reported total holdings of 21,626 shares on August 30, 2023, and his reported holdings of 16,294 shares on October 3, 2023. Further, this report indicates that an additional ***1,334*** shares held directly by Mr. Dhillon remained unaccounted for based on his reported acquisitions and RSUs earned.

243. On November 6, 2023, Punit Dhillon filed a Statement of Changes in Beneficial Ownership with the SEC on Form 4 indicating that, as of November 6, 2023, he had been awarded an additional 194,270 shares underlying RSUs approved by the Board on September 29, 2023 contingent upon approval by the shareholders approval of the amendment to the Restated Incentive Plan, effective November 6, 2023, bringing his reported total of shares underlying these RSUs to **297,006**. When awarded on November 6, 2023, these RSUs carried the same vesting conditions as the RSUs issued on August 25, 2023. At the time of Punit Dhillon's reporting, none of the vesting conditions were met.

244. Based on Mr. Dhillon's reported RSU award on his Form 4/A filed on August 30, 2023, this Form 4 indicates an additional ***21,626*** shares underlying RSUs that are unaccounted for under the reported grants listed on each form.

245. This Form 4 also indicated that, on that day, Mr. Dhillon was granted an additional 21,586 stock options under the Restated Incentive Plan. Like the 9,103 stock options granted on August 25, 2023, these options were to vest in equal monthly installments over the four-year period beginning August 24, 2023.

246. According to the Company, during the first quarter of 2024, the first three market-based vesting conditions of the RSUs approved on August 25, 2023 and September 29, 2023 were met, triggering their release by the Company.

247. Accordingly, depending on whether Punit Dhillon was the beneficial owner of 297,006 shares underlying these RSUs as recorded on November 6, 2023 or 275,380 shares underlying RSUs based on the removal of the unaccounted for RSUs in his reported total, as of the Company's reporting of all three market-based conditions met, Mr. Dhillon earned either 222,755 or 206,535 shares, respectively.

248. On March 4, 2024, Punit Dhillon filed an Amended Statement of Changes in Beneficial Ownership with the SEC on Form 4/A indicating that he had been awarded 100,000 shares underlying RSUs approved by the Board on February 29, 2024, bringing his reported total to 397,006 shares of common stock underlying these RSUs issued pursuant to the Restated Incentive Plan.

249. When awarded on February 29, 2024, these RSUs carried the following vesting conditions: 25% vests upon achieving a market cap of $750M and a stock price of $20.00 per share, an additional 25% vests upon achieving a market cap of $1B and a stock price of $25.00 per share, an additional 25% vests upon achieving a market cap of $1.25B and a stock price of $30.00 per share, an additional 25% vest at if the Company is acquired for total consideration of $1.5B or greater and a stock price of $35.00 per share. At no point during the Class Period were the market-based vesting conditions for these RSUs met.

250. In addition, Mr. Dhillon's Form 4/A indicated that on February 29, 2024, he was granted 125,000 stock options pursuant to the Restated Incentive Plan. The options were to vest in equal monthly installments over the four-year period beginning February 29, 2024.

251. When reporting the financial results for the year ended December 31, 2023 on Form 10-K, filed with the SEC on March 22, 2024, the Company provided, in pertinent part, that, as of March 20, 2024, Punit Dhillon beneficially owned

**289,780** shares of Skye which included: (i) 9,343 shares of common stock held by a family trust of which Mr. Dhillon is the trustee; (ii) **18,961** shares of common stock held directly by Mr. Dhillon; (iii) 1,326 shares of common stock issuable upon exercise of warrants; and (iv) 53,616 and **206,534** shares of common stock underlying options and RSUs, respectively, that may be exercised within 60 days of March 20, 2024.

252. This Form 10-K indicates that an additional ***1,333*** shares held directly by Mr. Dhillon are unaccounted for based on his reported holdings of 16,294 shares as of October 3, 2023, and when accounting for an award of 1,333 shares of common stock underlying the second of three equal installments of RSUs vested on December 14, 2023. Notably, this is in addition to the ***1,334*** shares held directly by Mr. Dhillon that remained unaccounted as of October 3, 2023, bringing the total of unaccounted for shares to 2,667 shares held directly by Mr. Dhillon.

253. Further, this report indicates that the additional ***21,626*** shares underlying RSUs in Mr. Dhillon's total amount beneficially owned following the reported transaction on November 6, 2023, were disposed of during the first quarter of 2024.

254. On August 27, 2024, Punit Dhillon filed a Statement of Changes in Beneficial Ownership with the SEC on Form 4 indicating that, as of August 26, 2024, he beneficially owned **422,076** shares of Skye which included: (i) 9,343 shares of common stock held by a family trust of which Mr. Dhillon is the trustee; and (ii) 412,733 shares held directly by Mr. Dhillon following his August 26, 2024 acquisition of 15,727 shares received in connection with Sciences pro rata distribution of Skye shares to Sciences shareholders pursuant to the MTA.

255. No explanation was given as to how Mr. Dhillon reached the number of beneficially owned securities following the reported transaction.

256. Based on his prior reported acquisitions and stock awards under the Company's incentive plan, the only way his total reported holdings of 412,733

shares is remotely feasible is if all shares of common stock underlying RSUs awarded on December 17, 2021 (4,000 shares) and all previously unaccounted for shares of common stock (2,667 shares) are removed from the equation leaving a total of 29,353 shares of common stock directly held by Mr. Dhillon, while also including only vested shares underlying RSUs awarded on August 25, and November 6, 2023 (206,535 shares), but also all unvested shares underlying RSUs awarded on February 29, 2024 (100,000 shares), and only stock options that may be exercised or that may vest within 60 days of reporting (75,519 shares), and his outstanding warrants (1,326 shares).

257. On November 19, 2024, Punit Dhillon filed a Statement of Changes in Beneficial Ownership with the SEC on Form 4 indicating that, as of November 18, 2024, he beneficially owned **339,166** shares of Skye which included: (i) 9,343 shares of common stock held by a family trust of which Mr. Dhillon is the trustee; and (ii) **329,823** shares owned directly by Mr. Dhillon following his sale of 82,910 shares underlying RSUs – putting his reported starting ownership at 412,733 shares prior this transaction. The report indicated that the sales were to satisfy tax withholding obligations to be funded by a "sell to cover" transaction.

258. Then, on April 25, 2025, Skye filed a Schedule 14A Definitive Proxy Statement with the SEC indicating, in pertinent part, that, as of April 18, 2025, Punit Dhillon beneficially owned **383,920** shares of Skye which included (i) 9,343 shares of common stock held by a family trust of which Mr. Dhillon is the trustee, (ii) **160,978** shares of common stock held directly by Mr. Dhillon, (iii) and 213,599 shares of common stock underlying options that are exercisable as of April 18, 2025 or that will become exercisable within 60 days after such date.

259. While this report once again indicates a discrepancy in Mr. Dhillon's holdings by 2,667 shares, it confirms that during the second half of 2024, Mr. Dhillon disposed of at least 4,000 shares underlying RSUs awarded under the Restated Incentive Plan.

260. Accordingly, in addition to the 82,910 shares sold on November 19, 2024, sometime between August 30, 2023, and October 3, 2023, Punit Dhillon disposed of ***5,332*** shares; sometime between January 1, 2024, and March 20, 2024, he disposed of ***21,626*** shares underlying RSUs awarded under the Restated Incentive Plan; and sometime between March 20, 2024 and August 26, 2024, he disposed of an additional ***4,000*** shares underlying RSUs. Based on the average closing prices for Skye's stock in each of these periods ($3.32, $7.10, and $9.74, respectively), Punit Dhillon received approximately $210,206 for these shares. This amount was in addition to the annual cash compensation he received from Skye, which was approximately $830,000 in 2025, $714,000 in 2024, and $720,000 in 2023.

*5. <u>Skye Shares Sold Through Sciences</u>*

261. In addition to insiders' off-loading of shares through the Company's registration statements, Class Period sales of Skye shares were strategically coordinated through the holdings of Sciences to recoup any remaining value in the Emerald Group.

262. On April 10, 2024, Punit Dhillon sent an email from his Skye email account directed to all Sciences shareholders. In this email, Mr. Dhillon detailed how "[o]ver the past year EHS has continued to consolidate operations and equity investments to drastically reduce G&A expenditure and determine a path for shareholders to gain liquidity through a reduction of capital through any remaining value left in EHS." He went on to explicitly address Sciences' ownership interest in Skye and described the anticipated distribution of Skye shares under the terms of the MTA as a "Return of Capital" event.

263. Indeed, when discussing the "EHS Winddown", Mr. Dhillon claimed that Sciences was expected to end the calendar year 2024 with minimal, if not, negative cash position. And pointing to the expected distribution of Skye shares, declared "we see no reason to continue operating EHS, as all of the remaining

equity (less any reasonable expenses and liabilities) should be distributed to the shareholders of EHS."

264. On August 26, 2024, under the terms of the MTA, Sciences distributed 424,910 Skye shares valued at approximately $2.91 million to its shareholders as a "Return of Capital" (from the 677,633 Skye shares it held in total). At the time of the "Return of Capital," MFDI owned approximately 37% of Sciences thereby entitling MFDI to approximately 157,000 Skye shares which, upon information and belief, were liquidated shortly after transfer.

* * *

265. Defendants Dhillon and MFDI committed manipulative and/or deceptive acts in furtherance of the alleged fraudulent scheme, namely by liquidating Skye shares through controlled persons and/or entities. The shares they disposed of were acquired for little, if any, consideration thereby resulting in virtually pure profit when these shares were sold.

266. SEC reporting requirements under Section 16, 15 U.S.C. §78p and 17 C.F.R. §240.16a-2, required Dhillon to report transactions promptly within two days of occurring. Dhillon did not comply with this requirement but instead disposed of his Skye shares for profit directly and indirectly through affiliates, including Sciences and MFDI.

267. Sciences' Central Securities Register evidences numerous transfers by/between individuals and entities related to Dhillon, such as the Dhillon Living Trust that he controlled. For example, on August 14, 2024, just prior to the "Return of Capital," Dhillon transferred over 1 million Sciences shares to himself from the Dhillon Living Trust. This transfer alone entitled him to over 12,000 shares of Skye in the "Return of Capital." These transfers along with the inconsistencies between Dhillon's ownership statements described above demonstrate a course of conduct involving concealed transfers and unreported sales for profit, similar to the insider trading scheme orchestrated by his uncle Dr. Avtar Dhillon.

268. By masking their financial interest in Skye and the proceeds they received by liquidating their shares for profits, Dhillon and MFDI engaged in a manipulative and/or deceptive act in furtherance of the pump-and-dump scheme alleged herein.

### J. The Truth is Revealed

269. On June 10, 2024, during pre-market hours, the Company issued a press release entitled, "*Skye Concentrates Strategy and Clinical Development Focus on Nimacimab Metabolic Program*," revealing that "its Phase 2a clinical trial of SBI-100 Ophthalmic Emulsion ('OE') in patients with primary open-angle glaucoma ('POAG') or ocular hypertension ('OHT') did not meet its primary endpoint for lowering intraocular pressure ('IOP')." Based on these results, Skye announced its decision to discontinue all clinical development and spending related to SBI-100 OE and any R&D associated with SBI-100, directing all clinical development resources to its metabolic program (*i.e.*, Nimacimab), and extending its operating runway into 2027.

270. On this news, Skye's stock price declined by $0.96 per share, or 8.78%, in single trading day.

271. Nevertheless, shares of Skye common stock continued to trade at artificially inflated prices as a result of Defendants' misconduct alleged herein, as the market remained confident in the potential of Skye and its development of nimaimab. For example, on June 10, 2024, Oppenheimer issued a report following the Company's announcement of SBI-100 OE's failure noting, "[a]lthough we view this result as disappointing, we support SKYE's decision as we now anticipate resource reallocation to further optimize development of nimacimab for obesity while extending expected cash runway into 2027."

272. The report went on to echo the Company's public sentiment that nimacimab "remains a promising and differentiated approach to obesity" and expressing that the analyst "view[ed] SKYE as financially well-positioned

following its 1Q24 update while recent uplisting to NASDAQ provides additional share liquidity enabling further investor demand."

273. Then, on October 6, 2025, during pre-market hours, Skye issued a press release announcing topline results from CBeyond revealing that the Phase 2a clinical trial had failed to meet its primary endpoint for weight loss and that "preliminary pharmacokinetic analysis showed lower than expected drug exposure, potentially indicating the need for higher dosing as a monotherapy."

274. Analysts reporting on the announcement lowered their price targets in response to Skye's increased clinical, regulatory, commercial, and financing risks. For example, Craig-Hallum's report entitled, "*Nimacimab Fails To Show Single Agent Weight Loss. Downgrading To HOLD, Lowering Price Target To $2*[,]" issued on October 6, 2025, provided, in relevant part, that "[a]lthough combo data shows nimacimab's potential for additive weight loss with a GLP-1, the lack of monotherapy weight loss is difficult to reconcile with nima's proposed MOA as a CB1 inhibitor," and as such, the analyst resolved to "lowering our probability of success for nima in obesity."

275. The report went on to note that "[t]he lack of efficacy was attributed to lower than expected drug exposure based on a preliminary PK analysis at Week 16 (n=18) that showed a wide range of drug concentration levels and identified an association between exposure and response." And while "SKYE plans to evaluate higher doses of nima[cimab] in future studies and sees a wide margin of safety," the report highlighted that "[t]he company's end of 2Q25 cash balance was $49M for runway into 1Q27, not including any planned Phase II studies."

276. On this news, Skye's stock price declined by $2.85 per share, or 60%, in single trading day.

**K. <u>Post-Class Period Events</u>**

277. On March 17, 2026, the Company announced its receipt of a deficiency letter from the NASDAQ notifying the Company that, for the last 30

consecutive business days, the closing bid price for Skye common stock had been below the minimum $1.00 per share required for continued listing. The Company has until September 14, 2026 to regain compliance.

## VI. LOSS CAUSATION AND ECONOMIC LOSS

278. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Skye's common stock and operated as a fraud or deceit on Class Period purchasers of Skye common stock by materially misleading the investing public.

279. Later, when Defendants' prior fraudulent conduct became apparent to the market, the price of Skye common stock materially declined, as the prior artificial inflation came out of the Company's share price over time. As a result of their purchases of Skye common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

280. Specifically, the Class Period inflation in Skye's stock price was removed when information concealed by Defendants' scheme and fraudulent misconduct was revealed to the market. As detailed *supra* in Section V.J., the information was disseminated through a series of partial disclosures occurring on June 10, 2024, and October 6, 2025, that revealed the nature and effect of Defendants' alleged misconduct. Each of these disclosures removed artificial inflation from Skye's stock price, causing economic injury to Plaintiff and other members of the Class.

281. The corrective impact of the alleged partial disclosure on June 10, 2024, however, was tempered by Defendants' scheme that continued to conceal the truth and obfuscate full nature and extent of Defendants' fraud. Indeed, the revelations made on June 10, 2024, did not on their own fully remove the inflation from Skye's stock price, because it only partially revealed the nature and ramification of Defendants' previously misrepresented and concealed conduct.

282. Defendants' continued scheme maintained the price of Skye common stock at a level that was inflated by fraud and induced members of the Class to continue purchasing Skye shares even after the partial disclosure. Thereafter, the information disseminated on October 6, 2025, revealed the full nature and effect of Defendants' alleged misconduct.

283. The stock price declines following each alleged corrective disclosure were due to firm-specific, fraud-related disclosures and were not the result of market, industry, or firm specific, non-fraud factors. The partial disclosures alleged herein, resulting in stock price declines, and descriptions thereof, are not necessarily comprehensive because fact and expert discovery are not complete.

## VII. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

284. At all relevant times, the market for Skye common stock was an efficient market for the following reasons, among others:

(a) Skye common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Skye communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Skye was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Skye was reflected in and incorporated into the Company's stock price during the Class Period.

285. As a result of the foregoing, the market for Skye's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Skye's stock price. Under these circumstances, all purchasers and/or acquirers of Skye common stock during the Class Period suffered similar injury through their purchase and/or acquisition of Skye stock at artificially inflated prices, and a presumption of reliance applies.

286. Alternatively, reliance need not be proven in this action because the action involves primarily omissions rather than affirmative misstatements. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## VIII. CLASS ACTION ALLEGATIONS

287. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased Skye common stock between April 11, 2024 and October 3, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are Defendants, Sciences, the current and former officers and directors of Skye and Sciences and their respective affiliates and related entities, members of the Individual Defendants' family and their legal representatives, heirs, successors or assigns and any entity in which any of the foregoing persons or entities have or had a controlling interest.

288. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Skye common stock were actively traded on the NASDAQ. Skye's annual report for the fiscal year ended December 31, 2025, filed with the SEC on Form 10-K on March 10, 2026, states

that "[a]s of March 9, 2026, there were 181 stockholders of record. The number of stockholders of record does not include beneficial owners of our common stock, whose shares are held in the names of various dealers, clearing agencies, banks, brokers and other fiduciaries." Industry practice confirms that the holders in street name are generally several times higher than those of record. Therefore, while the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are several hundred, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Skye or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of March 9, 2026, there were 33,378,764 shares of Skye common stock issued and outstanding.

289. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

290. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

291. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts violated the federal securities laws;

(b) whether Defendants engaged in a scheme to defraud;

(c) whether Defendants acted knowingly or with reckless disregard for the truth;

(d) whether the prices of Skye common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(e) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

292. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the proposed Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

***Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Promulgated Thereunder***

293. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

294. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) &(c) promulgated thereunder by the SEC.

295. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class and otherwise employed a scheme to defraud in connection with the purchase and sale of Skye securities. Defendants' scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Skye

common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Skye's securities at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, Defendants, and each of them, took the actions set forth herein.

296. Pursuant to the above wrongful course of conduct, each of the defendants participated directly or indirectly in the alleged plan, scheme, or conspiracy to defraud or deceive Plaintiff and other members of the Class.

297. By virtue of the Defendants' ownership and/or positions at Skye, the Defendants had actual knowledge of the scheme alleged herein and intended thereby to deceive Plaintiff and the other members of the Class.

298. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) & (c) promulgated thereunder.

299. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Skye common stock during the Class Period, as the truth about Skye's operations and business prospects began to be revealed to the investing public.

## COUNT II

### *Against Punit Dhillon and MFDI, LLC*
### *for Violations of Section 20(a) of the Exchange Act*

300. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

301. During the Class Period, Defendants Dhillon and MFDI participated in the operation and management of Skye and Sciences, and conducted and participated, directly and indirectly, in the conduct of their business affairs. Because of their senior positions and ownership of Skye and Sciences, Defendants

Dhillon and MFDI knew the material adverse non-public information concealed and/or misrepresented by Skye.

302. As an officer and director of a publicly owned company, Defendant Dhillon had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Skye which had become materially false or misleading.

303. By reason of his senior management and director positions, Defendant Dhillon had the power to direct the actions of, and exercised the same to cause, Skye to engage in the unlawful acts and conduct complained of herein. Defendants Dhillon and MFDI exercised control over Skye's and Sciences' operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. Throughout the Class Period, Defendants Dhillon and MFDI exercised their power and authority to cause Skye and Sciences to engage in the wrongful acts complained of herein. Defendants Dhillon and MFDI, therefore, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act.

304. By reason of the above conduct, Defendants Dhillon and MFDI are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Skye.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## X. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 15, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam Apton*
Adam M. Apton (SBN 316506)
Devyn R. Glass
(*pro hac vice* application forthcoming)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
aapton@zlk.com
dglass@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*